**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| RODERICK JACKSON,<br><br>                    Plaintiff,<br>     v.<br><br>POST UNIVERSITY, INC.,<br><br>                    Defendant. | 3:08 - CV- 1810 (CSH) |

---

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

HAIGHT, Senior District Judge:

## I.     INTRODUCTION

Plaintiff Roderick Jackson (herein "plaintiff" or "Jackson") is a black African-American who brings this civil rights action against his former employer, defendant Post University ("defendant," "Post," or "the University"), alleging in his complaint that on March 2, 2007, Post unlawfully terminated his employment on the basis of his race and color in violation of 42 U.S.C. § 1981 (first cause of action) and the Connecticut Fair Employment Practices Act ("CFEPA") (second cause of action).[1] *See* Doc. #1.  After exhausting state administrative remedies with respect

---

[1] 42 U.S.C. § 1981, captioned "Equal rights under the law," provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

to his CFEPA claim and thereby receiving a "Release of Jurisdiction" from the Connecticut Commission on Human Rights and Opportunities (*see* Part II.A, "Jurisdiction," *infra*),[2] plaintiff filed his complaint in this Court on December 1, 2008.[3]

Defendant has moved pursuant to Fed. R. Civ. P 56(a)(1) for summary judgment on both

---

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

The Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, states, in relevant part:

(a) It shall be a discriminatory practice in violation of this section:

(1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race [or] color . . . .

[2]*See* Conn. Gen. Stat. § 46a-101 ("[n]o action may be brought in accordance with section 46a-100 unless the complainant has received a release from the commission in accordance with the provisions of this section").

[3]The Court notes that, unlike his state CFEPA claim, plaintiff's federal § 1981 claim is not subject to an administrative exhaustion requirement. *See Holt v. Continental Group, Inc.*, 708 F.2d 87, 89-90 (2d Cir. 1983) (citing *Gresham v. Chambers*, 501 F.2d 687, 690-91 (2d Cir.1974). *See also Hollander v. Sears, Roebuck & Co.*, 392 F. Supp. 90, 94 (D. Conn. 1975) (noting Second Circuit in *Gresham*, 501 F.2d at 690-91, definitively rejected argument that before commencing § 1981 action, plaintiff was required to exhaust his administrative remedies before the EEOC).

causes of action alleged in the complaint. Doc. #20. Specifically, defendant maintains that there is no genuine issue of material fact that prevents entry of judgment on its behalf as a matter of law because plaintiff has failed to provide evidence of racial bias. Moreover, defendant argues that there is a presumption against the existence of discriminatory intent in plaintiff's discharge because the Post employee who participated in hiring plaintiff is the same person who made the decision to terminate his employment less than eleven months later. Doc. #21, p. 17-18.

## II.    JURISDICTION & VENUE

### A.    Jurisdiction

This Court has "federal question" subject matter jurisdiction over plaintiff's Section 1981 claim pursuant to 28 U.S.C. §§ 1331[4] and 1343(a)(4).[5] Plaintiff's section 1981 claim patently arises under federal statute, 42 U.S.C. § 1981, *et seq*., and also seeks to recover damages for the violation of civil rights.[6]

Moreover, this Court has discretion to exercise supplemental jurisdiction over plaintiff's

---

[4]28 U.S.C. § 1331 confers original jurisdiction upon the district courts "of all civil actions arising under the Constitution, laws, or treaties of the United States."

[5]28 U.S.C. § 1343(a)(4) confers "original jurisdiction of any civil action ... [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights. . ."

[6]"There is no express provision in 42 U.S.C.A. § 1981 authorizing civil enforcement actions. Section 1981 is a remedial statute which does not, in itself, confer jurisdiction on any court. The federal jurisdictional statute for civil rights and elective franchise suits, [28 U.S.C. § 1343], which grants original jurisdiction to the district courts for any civil action instituted to recover damages or to secure equitable or other relief under any act of Congress providing for the protection of civil rights, has been held to be the proper source of jurisdiction for § 1981 suits." 45B Am. Jur. 2d *Job Discrimination* § 1858 (Westlaw 2011).

CFEPA claim, Conn. Gen. Stat. § 46a-60, *et seq.*, pursuant to 28 U.S.C. § 1367(a).[7]  Plaintiff's

CFEPA claim, based on racial discrimination with respect to the termination of his employment by

Post, is "so related to" his federal Section 1981 claim "that they form part of the same case or

controversy." 28 U.S.C.§ 1367(a).   Specifically, both claims  derive from a common nucleus of

operative fact.   *See Dixon v. Int'l Fed'n  of Accountants*, 416 F. App'x 107, 111 (2d Cir. 2011)

("Claims form part of the same case or controversy when they 'derive from a common nucleus of

operative fact.'")(quoting  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997)).

Accordingly, it is within the Court's discretion to exercise jurisdiction over plaintiff's state CFEPA

claim, and I do so.

Furthermore, plaintiff asserts that he has exhausted all administrative remedies required as

a precondition to commence a court action on his CFEPA claim, Conn. Gen. Stat. § 46a-60 (a) (1).

Namely, plaintiff filed a charge of employment discrimination on the basis of race or color with the

Connecticut Commission on Human Rights and Opportunities ("CCHRO") on May 4, 2007, within

the requisite 180-day period following his termination.   He thereafter received  a  "Release of

Jurisdiction" from the CCHRO,  issued on September 3, 2008.[8]  Doc. #1, p. 12-13 (Ex. 1).  Plaintiff

---

[7]Section 1367, entitled, "Supplemental jurisdiction," states in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

[8]Connecticut General Statute Section 46a-82(f) mandates that "[a]ny complaint filed pursuant to this section [46a-60] must be filed within one hundred and eighty days after the alleged act of discrimination." Conn. Gen. Stat. § 46a-82(f). Therefore, in the case at bar, plaintiff was required to file his charge with the CCHRO by August 29, 2007 – *i.e.*, within 180

then filed the present action in United States District Court on December 1, 2008, within 90 days of

receiving the release. Doc. #1. *See* Conn. Gen. Stat. § 46a-101(e) ("Any action brought by the

complainant in accordance with section 46a-100 shall be brought within ninety days of the receipt

of the release from the commission."). Plaintiff has thus followed the requisite state administrative

procedures to allow this court to exercise subject matter jurisdiction over his CFEPA claim. *See,

e.g., Collins v. Univ. of Bridgeport*, 781 F.Supp.2d 59, 62 (D. Conn. 2011) ("To maintain an action

for discriminatory practices under Conn. Gen. Stat. §§ 46a-58 through 46a-81, a plaintiff must first

exhaust her administrative remedies."); *Anderson v. Derby Bd. of Educ.*, 718 F. Supp.2d 258, 271-72

(D. Conn. 2010). Post does not contend that Jackson did not comply with these statutory

requirements.

### B.    <u>Venue</u>

Venue is proper in this District pursuant to 28 U.S.C. § 1391. Section 1391(b) provides that

"[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship" may only be

brought in three specified judicial districts:

> (1) a judicial district where any defendant resides, if all defendants reside in
> the same State, (2) a judicial district in which a substantial part of the events
> or omissions giving rise to the claim occurred, or a substantial part of
> property that is the subject of the action is situated, or (3) a judicial district
> in which any defendant may be found, if there is no district in which the
> action may otherwise be brought.

28 U.S.C. § 1391(b). In the present action, plaintiff contends, without dispute, that Connecticut

is the judicial district in which the events giving rise to the claim occurred. Plaintiff was employed

---

days after March 2, 2007, the date his employment was terminated. As stated *supra*, plaintiff
filed his charge with the CCHRO on May 4, 2007.

in Connecticut and all events leading to his discharge occurred within that state.

## III.    FACTS

The facts established by the record are as follows.

### A.    Hiring of Plaintiff

In March of 2006, Edmond Lizotte, Post's Director of Human Resources, and Cheryl Gatling, Post's Office Manager of Admissions, participated in a job fair for the purpose of hiring an individual to fill a newly created position of field admissions representative. Plaintiff Jackson attended the fair.[9] Jackson Depo., p. 114, l. 10-13; Lizotte Depo., p. 13, l. 7-20.[10] Lizotte observed plaintiff walk by the recruiting table four times before intercepting him to query whether he was interested in obtaining a position with Post. Lizotte Dep., p. 11, l. 21 to p. 12, l. 13. Lizotte interviewed plaintiff and asked him what he was "looking to do." *Id.*, p. 12, l. 3-9; *see also* Jackson Dep., p. 116, l. 22 to p. 117, p. 2. In the process of the interview, Lizotte examined plaintiff's resume and determined that he had prior experience in sales but none in college recruitment.[11]

_____

[9]According to a thank you email dated March 17, 2006, from plaintiff to, *inter alia*, "Cheryl, Madelaine, and Ed for catching [his] attention at the job fair," an additional Post employee named Madelaine Kelsey participated in the job fair on that day. Lizotte Depo., Ex. A, *see also* Lizotte Dep., p. 11, l. 9-20; p. 13, l. 7-20. Madelaine's title does not appear in the record and there is no testimony regarding any interactions with plaintiff at the job fair.

[10]Portions of plaintiff's and Lizotte's depositions have been entered into the record by both parties. These depositions appear at Doc. #21-2, 25-15, and 25-16.

[11]Lizotte testified that because plaintiff had a sales background, Post "felt that they could train him on the . . . college admissions enrollment process." Lizotte Dep., p. 17, l. 17 to p. 18, l. 3. In other words, sales skills, such as "being able to make phone calls, being able to close, [and] being able to overcome objections" were considered to be transferrable to the new position. *Id.*, p. 18, l. 3-6. Plaintiff admittedly had no previous experience in college recruitment. *Id.*, p. 17, l. 19-22; Jackson Dep., p. 167, l. 4-12.

Lizotte Dep., p. 12, l. 9-10.  Lizotte had an overall favorable impression of the way plaintiff conducted himself during the interview so he suggested that plaintiff attend a follow up interview with Dominick Miciotta, who was at that time Post's Vice President of Enrollment Management.[12] *Id.*, p. 12, l. 14-20.

Lizotte thereafter discussed plaintiff's application with Miciotta, recommending plaintiff as a candidate for the field admissions representative position.  *Id.*, p. 12, l. 14-20; Jackson Dep., p. 121, l. 22 to p. 122, l. 3.  Two weeks after the job fair, Miciotta phoned plaintiff and set up an on-campus interview.  Lizotte Dep., p. 12, l. 14-20; Jackson Dep., p. 121, l. 22 to p. 122, l. 3.

On the day of the interview with Miciotta, plaintiff also spoke with various other management-level employees at Post, including Lizotte and the outgoing President, Jon Jay DeTemple.  Jackson Dep., p. 126, l. 19-23; l. 153, l. 2-6; p. 154, l. 7-11.

Miciotta made the determinative decision to hire plaintiff to work directly under him.  Lizotte Dep., p. 16, l. 7-14.  While Miciotta did not need clearance to make this decision, Lizotte acquiesced

---

[12]Plaintiff stressed at his deposition that he mostly spoke with Cheryl Gatling at the job fair and left his resume with her.  Jackson Dep., p. 113, l. 1 to p. 114, l. 1.  Plaintiff did, however, concede that he recalled also speaking with Lizotte on that day:

A.    I must have.  I had to have spoken to [Ed Lizotte].  I don't know what we talked about.  Apparently it was the position.

Q.    So what did Ed Lizotte tell you about the position?

A.    It was Ed Lizotte, just the generics.  They were recruiting for a field admissions rep.

Jackson Dep., p. 114, l. 7-13.

in it.[13]   *Id.*   Lizotte telephoned plaintiff and offered him the position of field admissions representative.  Jackson Dep., p. 154, l. 19-24; p. 155, l. 7-20.   Plaintiff accepted the offer during that phone conversation with Lizotte.  *Id.*, p. 159, l. 1-15.  On March 30, 2006, Post's then President DeTemple  wrote plaintiff a letter to confirm plaintiff's agreement to accept the field admissions representative position, with an effective start date of April 17, 2006.  Lizotte, Dep., Ex. B; Jackson Dep., p. 155, l. 21-25, p. 158, l. 5-10.    On April 17, 2006, Miciotta sent an "Organizational Announcement" email to all Post staff, welcoming plaintiff to Post.  Lizotte Dep., Ex. C.

### B.      April 17, 2006 to June 5, 2006 - Field Admissions Representative

During the initial term of his employment, Jackson  worked primarily from his home in West Hartford and was responsible for "in person" recruitment of high school students in Connecticut. In this field admissions capacity, he traveled to high schools and career fairs to meet and encourage students to apply for admission to Post.  Jackson Dep., p. 177, l. 16 to p. 181, l. 17.   To assist plaintiff in attaining his objectives, Miciotta, as his direct supervisor, provided plaintiff with marketing materials, databases of high schools and adult education centers, and the mandatory number of high schools for plaintiff to contact each day.[14]  *Id.; see also id.,* p. 181, l. 16-23.

Plaintiff testified that, from April 17, 2006, to June 5, 2006, he got along "okay" and "fine" with his direct supervisor, Miciotta.  *Id.*, p. 186, l. 21-25  He also agreed that everyone in the various Post departments was "cordial" with him during the initial weeks of his employment.  *Id.*, p. 170,

---

[13]When Miciotta informed Lizotte that "we're going to hire [Jackson]," Lizotte replied, "okay."  Lizotte Dep., p. 13, l. 5-6.

[14]Jackson testified that he received a briefcase from Post with interest cards for him to hand out at career fairs.  He was also given an apron for the career table and marketing materials, such as "sleeves" with majors.  Jackson Dep., p. 177, l. 12-18.

l. 2-4.

### C. June 5, 2006 - Online Enrollment Representative

On June 5, 2006, Miciotta met with plaintiff to inform him that his job duties were modified to incorporate those of an online enrollment representative. Jackson Dep., p. 176, l. 18 to p. 177, l. 18; 187, l. 11-22; p. 193, l. 13-19. In that altered position, plaintiff retained his field admissions representative title and salary but was also responsible for online recruiting. Lizotte Dep., Ex. D (Memo from Miciotta to Jackson re: Restructure of Job Duties, dated 6/12/2006). After four initial weeks of on-campus training with his new supervisor, Veronica Marrero, Assistant Director of Online Admissions, plaintiff resumed working from home.[15] *Id.* Miciotta provided plaintiff with a list of various daily and weekly recruiting goals, all of which plaintiff considered "doable."[16] Jackson Dep., p. 188, l. 7-11.

### D. June 22, 2006 - Erroneous Notice of Termination/Miscommunication by Lizotte

On June 22, 2006, Lizotte mistakenly notified plaintiff that his employment with Post was terminated. Lizotte Dep., p. 30, l. 11-18. Lizotte explained in his deposition that plaintiff's former field admissions position was eliminated "because of the expense involved with going out and doing things." *Id.*, p. 28, l. 12-21. According to Lizotte, Post's "decision-makers" did not feel that they were getting an adequate return on their investment in the position – *i.e.*, "it didn't seem like the

---

[15]To that end, in addition to his title and salary, plaintiff was allowed to "keep [his] laptop, cell phone and supplies purchased for [his] home office." Lizotte Dep., Ex. D, para. 5.

[16]Jackson specifically testified that his duties of making 75 to 100 dials per day and performing 3 to 6 interviews per day were possible in that "[t]here were people that were doing it" and these duties "could be done." Jackson Dep., p. 187, l. 14 to p. 188, l. 12.

results that Rod [Jackson] was doing in the position were panning out."[17] *Id.*   When management decided to eliminate the position, Lizotte erroneously believed that Jackson himself was terminated and so informed him.[18]   *Id.*, p. 30, l. 19 to p. 31, l. 22.   Miciotta had, however, as stated *supra*, already informed plaintiff that, although his exclusively field-based  position was eliminated, he would retain his employment with Post and take on online enrollment duties under the direct supervision of Veronica Marrero.  Moreover,  plaintiff would retain his salary level, which was higher than that of the other current online enrollment representatives.[19] Jackson Dep., p. 195, l. 17-21.

When Lizotte informed plaintiff that he was terminated, plaintiff  protested, asserting  that Miciotta had already offered him an online enrollment position.  *Id.*, p. 205, l. 13-15 13-15.  Plaintiff thus stated, "Dominick offered me the position.  He didn't tell you?"  *Id.*, p. 205, l. 13-15; *see also* Lizotte Dep., Ex. G.  Lizotte consulted Miciotta about the situation and discovered that plaintiff was indeed correct.  Lizotte Dep., p. 30, l. 19-21.   Lizotte then both phoned and emailed plaintiff to

---

[17]Lizotte testified that, at that time, the enrollment management department was "in a state of flux. . . [in an effort] to expand."  Lizotte Dep., p. 34, l. 17-25.  There were "major high level changes" going on:  Lizotte was preparing for an upcoming board meeting and there were new additions to the board (*e.g.*, a new president, Dr. Patricia Sanders, replacing John Jay DeTemple).  *Id.*, p. 35, l. 1-18.  There were new directives "coming down with regards [to] enrollment management."  *Id.*, p. 35, l. 15-18.   The new president, Dr. Sanders,  had some questions about "the efficacy of the field position," ultimately resulting in its elimination.  *Id.*, p. 36, l. 3-7.

[18]Lizotte testified that Miciotta had told him, "We're just eliminating [the field admissions] position.  I said, [']Is there anything else that I need to do for you?[']  He said no.  So I assumed – I made the assumption that that meant that Rod's position and Rod was being eliminated."  Lizotte Dep., p. 32, l. 6-12.

[19]Due to plaintiff's higher salary level than that of his colleagues, Miciotta instructed plaintiff not to disclose his salary to the other online enrollment employees.  Jackson Dep., p. 195, l. 14 to p. 196, l. 1.

apologize for his "BIG miscommunication." *Id.*, Ex. H (Email from Lizotte to Jackson, 6/22/2006, at 1:04 p.m.); *see also id.,* p. 30, l. 19-25; p. 32, l. 12-16. He explained, "[w]e have had some major high level changes and things got screwed up."[20] *Id..* Ex. H. He apologized for his previous, erroneous phone call, acknowledging that it "must have been upsetting." *Id.* Lizotte testified that he took it "personally" that he had upset Jackson because he "doesn't like to do harm to people." *Id.*, p. 33, l. 16-18.

Plaintiff responded to Lizotte's apology by email, generously assuring Lizotte that there was "[n]o problem" and that he would see Lizotte and Miciotta at work the next morning. Lizotte Dep., Ex. H (Email from Jackson to Lizotte, 6/22/2006, at 5:22 p.m.). Plaintiff acknowledges that, as far as he knew, the "miscommunication" from Lizotte was a misunderstanding. Jackson Dep., p. 206, l. 16-18.

Plaintiff testified that he did not, however, believe that the field admissions representative position was actually eliminated because it "wasn't in the budget," as he was told. *Id.*, p. 205, l. 5-11. He reasoned that this could not be true because he was "just offered . . . a job as an online rep for the same amount of money." *Id.*, l. 13-15. Furthermore, plaintiff was not pleased about his newly assigned position in general. He testified that he had a "gut feeling" that he was being demoted because he was a black person.[21] *Id.*, p. 188, l. 13-17.

---

[20]Plaintiff testified that Lizotte initially told him that the field admission job "wasn't in the budget." Jackson Dep., p. 205, l. 5-11. When plaintiff protested that he had been offered a new position by Miciotta, Lizotte allegedly stated, "Wait, let me call you back. Let me find out what's going on." *Id.*, p. 205, l. 18-21. Lizotte then called plaintiff back to say that the "field admissions position was going away and that [plaintiff] wasn't." *Id.*, p. 206, l. 11-13.

[21]Plaintiff presented no evidence to support his feeling. He testified, in relevant part:

[M]y feeling was that I was being demoted. Nobody else was told to do any of

In June of 2006, during plaintiff's on-campus training, his new supervisor, Marrero, reported that plaintiff exhibited outward signs of disinterest in his new position. Lizotte Dep., Ex. F (Email from Marrero to Miciotta, cc: Lizotte, 6/12/2006, at 7:05 p.m.). Marrero voiced concerns about plaintiff's attitude regarding the new role he would play because "he was really not sure of his role at all." *Id.*, para. 1. She thus wrote to Miciotta and Lizotte on June 12, 2006, describing plaintiff's demeanor as follows:

> During training, Rod seemed very indifferent and honestly un-interested. At one point, I had to even suggest that [he] write something down, that I felt was of value to him, because I hadn't seen him take ANY notes. I am concerned that he feels that he is in a position that he has no choice BUT to take. Furthermore, now, having discussed this with him in greater detail, it is evident that he may not feel like this is the best use of his skills.

*Id.*, para 2.[22] Marrero further described plaintiff as noticeably surprised when he was told of the "preference to working 11-8, every day" and "he [even] tried to imply that he'd be 'leaving in 15 minutes'" when it was only 5:00 p.m. *Id.*

Marrero summarized her disappointment in Jackson's attitude regarding his online enrollment position as follows:

> Like you [Miciotta], one of my primary requirements is to have a positive attitude, and more importantly, to WANT to be here. . . . . [I]n our meeting I got the distinct impression that he might think that this position is a step down, or as he said, that it

_____

> this stuff. It was becoming an online enrollment rep, is not what I signed up to do. I felt that way because I'm a black person. Does that make sense?

Jackson Dep., p. 188, l. 13-17.

[22]Jackson explained in his deposition that he "didn't feel like [he] needed to be writing that [information] down because [he] didn't feel that that part of [Marrero's] training was important for [him] right then and there." Jackson Dep., p. 203, l. 23 to p. 204, l. 2.

would not make good use of his greatest skills? . . . I understand that this may not be what he initially signed up for. Despite that, I was hoping he'd be more optimistic about this opportunity on our team.

*Id.*, para. 3.[23]

Similarly, in describing a meeting with plaintiff and Marrero regarding the restructuring of

plaintiff's position, Miciotta emailed Lizotte as follows:

Veronica [Marrero] has voiced concerns about Rod's desire to do the job. We asked Rod if he wanted to do this job, he answered the question by saying he could do it, but would me more successful in another role. . . .
. . . .
Rod voiced that if he were not meeting his targets in the role he understood if we fired him.

Lizotte Dep., Ex. E (Email from Miciotta to Lizotte, 6/12/2006, 4:06 p.m.), para. 2, 7.

Lizotte summarized in his testimony that there were issues with Jackson's performance when

his position became focused on online admissions:

[T]here was some discussion on performance. It didn't seem he was doing what he was required to do, . . . what was expected of a field enrollment position. . . . [I]t requires a lot of initiative, a lot of self-determination, a lot of understanding of how to develop certain markets.

Lizotte Dep., p. 37, l. 4-10.

### E.    August 2006 - Revival of field admissions position

In July of 2006, the Post Board of Trustees held a meeting and decided to give Miciotta

"marching orders" to revive field admissions. Lizotte Dep., p. 37, l. 11-21. Specifically, the trustees

---

[23]Plaintiff himself testified that he later told Miciotta that he was "not hired for" online enrollment; he was "hired to be a field admission rep." Jackson Dep., p. 196, l. 2-9. Furthermore, he did not want to work the phones because he was the type of salesman who is "successful in the field." *Id.*, p. 198, l. 18-23. *See also id.*, p. 216, l. 5-8  ("I just remember that I believe we had a conversation and I said, 'I don't feel comfortable doing the online thing. I'm a field guy.'").

determined that field admissions were necessary for "growth and expansion." *Id.*, p. 36, l. 14-25. In late July or early August, Miciotta was informed that he would "have a total of three field people" and be given a budget to sustain these positions. *Id.*, p. 40, l. 16 to p. 41, l. 3. According to Lizotte, Miciotta needed someone with field experience "to manage field people" because his own background was in a "call center environment." *Id.* p. 39, l. 16-25. Miciotta thus sought someone with experience in "break[ing] into the high school market." *Id.*, p. 37, l. 19 to p. 38, l. 7. Lizotte recommended Ron Silva, a former National Guard recruiting supervisor and expert in such field work, to personally supervise and conduct field recruitment operations. *Id.*, p. 38, l. 4-5, 11-25. Silva had been an area supervisor under Lizotte when Lizotte was a "recruit and retention battalion commander [in the National Guard] for the State of Massachusetts."[24] *Id.*, l. 14-18. According to Lizotte, at one time, Silva received the award for "Chief's 50 Winner," the number one recruiter for Massachusetts.[25] *Id.*, l. 22-25.

When Lizotte recommended Silva to Miciotta, Silva was working as a bank manager at the Bank of America in Newport, Rhode Island. *Id.*, p. 39, l. 2-12. Lizotte described Silva as bored and anxious to return to "get out and meet with young men and women to talk about their future, work with guidance counselors on different things." *Id.*, l. 9-12. Miciotta interviewed and then ultimately hired Silva to be Director of Field Admissions, starting in October or November of 2006. *Id.*, p.

---

[24]Prior to his experience at Post, Lizotte served as a Lieutenant Colonel and recruiting battalion commander for the Massachusetts Army National Guard. In that position, he had overall responsibility for recruiting new Guard members from high schools throughout Massachusetts with a staff of sixty-five field recruiters. Lizotte Dep., p. 18, l. 10-16.

[25]Silva was one of Lizotte's key area recruiter supervisors in the National Guard. He had retired as a Master Sergeant with the Guard after being the number one recruiter in Massachusetts. Lizotte Dep., p. 38, l. 11 to p. 40, l. 12.

41, l. 8-16; Jackson Dep., p. 229, l. 9-14, l. 17-22, and l. 23-25.

For the other two field positions, with the title of "field admissions representative," Miciotta retained plaintiff to fill one position and, in October of 2006, hired a new employee named Jared Swerzenski to fill the other.[26] Lizotte Dep., p. 40, l. 16 to p. 41, l. 7; p. 54, l. 5-6, 12-15. Lizotte testified that Swerzenski received a significantly lower salary than plaintiff because he had less sales experience. *Id.*, p. 42, l. 16-24. Miciotta was nonetheless reportedly impressed with Swerzenski's ability to perform a mock sales presentation as part of the interview process. *Id.*, p. 42, l. 24 to p. 43, l. 12. Lizotte explained that Swerzenski possessed the ability to overcome objections and close a sale. *Id.*

In August of 2006, at the time when Miciotta was directed to revive field admissions, he provided plaintiff with a work plan to "help [him] in his position . . . [and] to give him focus." Lizotte Dep., Ex. I & J, and p. 50, l. 6-16. This work plan was a compromise in that it incorporated both field duties and online enrollment. Jackson Dep., p. 213, l. 6-12 and p. 214, l. 16-25. In particular, the plan explained plaintiff's responsibilities and mapped out his territory for recruitment. Lizotte Dep., p. 50, l. 16-24.

Plaintiff recalls that, from June 2006 until Miciotta addressed the "work plan for the coming year," plaintiff continued to voice discontentment with his position in a number of conversations with Miciotta. Jackson Dep., p. 215, l. 19-24; & p. 216, l. 5-8 (Plaintiff informed Miciotta, "I don't feel comfortable doing the online thing. I'm a field guy."). With respect to Miciotta and the other

---

[26]From June until August of 2006, plaintiff focused on online recruitment until his responsibilities were revamped to include field recruitment for the advanced degree program, with a focus on high schools, hospitals, banks, police stations, and businesses with more than twenty-five employees. Jackson Dep., p. 226, l. 17 to p. 229, l. 8.

Post employees he encountered at this time, plaintiff testified that he got along "okay" with them. *Id.*, p. 226, l. 8-16.

### F.    <u>Marijuana Incident</u>

On one occasion when Silva held a lunch meeting in the Post cafeteria with plaintiff and Swerzenski, plaintiff alleges that he was the target of a racially motivated insult by Silva.[27]   Plaintiff deemed the event the "infamous marijuana incident" and described it as follows:

> A.    We were there.  I guess we were there and he [Silva] said he wanted to get to know us a little better.  And I was having an issue with my eye and –
>
> Q.    What was the issue with your eye?
>
> A.    It was hurting.
>
> Q.    Okay.
>
> A.    So I said that I needed to see an ophthalmologist, optometrist, essentially an eye doctor.  And he said to me, "It must be the marijuana."  And so I said to him –
>
> Q.    What exactly – what were the words he actually used?
>
> A.    "It must be the marijuana."
>
> Q.    Okay.  What did you say?
>
> A.    I said, "All black men don't smoke weed."  I said, "I don't smoke weed."  And he said, "Well," then he said, I guess he caught himself and he said, "I'm just playing.  I'm just playing."  At that point I kind of walked away.

Jackson Dep., p. 251, l. 2 to p. 252, l. 6.

---

[27]Lizotte testified that both Silva and Swerzenski are Caucasian.  Lizotte Dep. p. 42, l. 12-15.

Plaintiff clarified that he considered Silva's comment about marijuana to be racially motivated because "there is some stereotype out there that African-Americans smoke marijuana." *Id.*, p. 252, l. 12-18.   When asked where he had heard about this stereotype, plaintiff replied, "everywhere."[28]  *Id.*, l. 19-25.

Plaintiff testified that he believes that Silva said he was "just playing" because "apparently" Silva "did not want [him] to be offended."  *Id.*, p. 254, l. 7-16.  Nonetheless, plaintiff remained offended because it was "too late" to take back such an insult.  *Id.*, l. 14-16.  "That's like shooting somebody and saying I'm sorry."  *Id.*

Despite this incident, plaintiff testified that Silva treated him "okay" when the two of them drove together to various schools to perform their recruiting duties.  *Id.*, p. 265, l. 1-11.  He also conceded that they "got along together."  *Id.*, l. 12-15.  Plaintiff further conceded that, apart from Silva's gratuitous and unfortunate remark during the lunch meeting about Jackson's supposed marijuana consumption, neither Silva, nor Miciotta, nor anyone else at Post ever directed an epithet or slur toward Jackson which he interpreted as racial in nature.  *Id.*, p. 265, l. 16 to p. 266, l. 6.  The qualification of Jackson's interpretation is necessary because, as noted *infra*, Silva's "marijuana" remark is capable of non-racial interpretations.

**G.**    **Personal Day on Date of Mandatory Meeting, February 21, 2007**

On February 17, 2007, Lizotte emailed all members of Day Admissions and Field Admissions that there would be a mandatory meeting at 10:00 a.m. on February 21, 2007, at the

---

[28]Plaintiff testified that he heard the stereotype regarding African-Americans and marijuana several times and saw a doctored photograph on the internet of Barack Obama smoking a bong.  Jackson Dep., p. 253, l. 5-23

Torrance Conference Room of the Post campus.  Lizotte Dep., Ex. K (Email from Lizotte to admissions employees, including, *inter alia*, Silva, Jackson, & Swerzenski, 2/27/2007, at 11:23 a.m.).  Lizotte instructed anyone who would be unable to attend to "please email me and let me know the reason why you will not be able to attend." *Id.,* para. 1. Three days later , on Tuesday, February 20, 2007, *i.e,* one day before the meeting, plaintiff emailed one line to Lizotte: "I am taking a personal day on Wed., " without providing further explanation. *Id.* (Email from Jackson to Lizotte, 2/20/2007, at 9:11 a.m.).  Lizotte responded to plaintiff, asking him specifically, "What is the purpose of the personal day?" *Id.*, Ex. L (Email from Lizotte to Jackson, 2/20/2007, at 10:03 a.m.). Plaintiff did not respond.  Jackson Dep., p. 278, l. 11-24.

The next day, Lizotte followed up with a second email, noting, "I did not get a response back from you on this.  I did not see an approved PTO request anywhere about this.  This meeting was important, important enough to have the President attend." Lizotte Dep., Ex. L (email from Lizotte to Jackson, cc: Silva, 2/21/2007, at 11:12 p.m.).  Lizotte then instructed Jackson that "[b]y the end of business on Thursday, you will provide me with the reason why you could not attend the meeting." *Id.*  Moreover,"[a]n email will not suffice" so  "please come to campus on Thursday" to meet at 4:00 p.m. *Id.*  Lizotte concluded with a line addressed to Silva: "Ron, Sorry to be going over your head, but this needs to be addressed now." *Id.*

Plaintiff neither responded to Lizotte's email nor traveled to campus to attend the requested 4:00 p.m. meeting because, in plaintiff's opinion, "Ron Silva took care of it" – *i.e.*, Silva had confirmed that "Rod did have an approved day off."  Jackson Dep.*,* p. 284, l. 25 to p. 285, l. 25. Specifically, plaintiff contends that he "was already cleared [by Silva] for [his] personal day" before February 17. *Id.*, p. 279, l. 4-10.   He thus concedes that he did not respond to Lizotte's query (via

email on February 20, 2007) regarding the "purpose of the personal day" because he "talked to Ron about it." *Id.*, p. 280, l.1.  Plaintiff explained at his deposition that he spoke to Silva and Silva spoke to Lizotte.  *Id.*, p. 281, l. 8-12; p. 282, l. 7-12.  " I didn't have to tell him why I was taking a personal day."  *Id.*, p. 279, l. 1-20.

Lizotte, however, remained upset that Jackson chose to take a personal day on the date of the mandatory meeting with the University president.  He thus testified:

> From my aspect, I understand, you know, the need to be able to take a personal day here or there, but there was no question, at least from my mind, . . . when you're going to have the president of the university at a meeting to be able to discuss what is going on and the requirement for admissions, you might want to be there.

Lizotte Dep., p. 55, l. 6-13.   Lizotte clarified that when he later chose to terminate plaintiff, the failure to attend the meeting was not "the reason" for termination, but was one factor that he considered.  *Id.*, p. 55, l. 16-22 ("it was part of a number of things").   At his deposition, plaintiff did not recall having "any other issues" (than the "personal day" incident)  with Lizotte.  Jackson Dep., p. 286, l. 1-3.

### H.      February 2007 - Budgetary Cuts

In February of 2007, Miciotta's position was terminated by Post's Board of Trustees due to necessary drastic cuts to the budget.  Lizotte Dep., p. 43, l. 16-24.   The field admissions department "had not yet hit [its] fall enrollment numbers and had not hit a series of the online modular numbers or site numbers." *Id*.   As described by Lizotte, the department's "budget was not being met."[29]  *Id*.

---

[29]Lizotte specifically testified that the budgetary problems prompted Post to decide to "make, across the university, a number of departmental cuts." Lizotte Dep., p. 43, l. 25 to p. 44, l. 12.  These cuts were "severe" and "hurt every department," including data entry, admissions, financial aid, academic advising, career services, and marketing.  *Id.*, p. 44, l. 6-12.

The decision was thus made to "make some . . . 'Jacobian [sic] cuts' and [Miciotta's] position was one of the ones cut."[30]  *Id.*, p. 43, l. 19-24.

Lizotte was then asked to fill in as Interim Director of Admissions until Post could find a viable candidate.[31]  *Id.*, p. 44, l. 13-22.  Lizotte simultaneously retained his title of Director of Human Resources, "wearing two hats at the [same] time" for a period of six to seven months.  *Id.*, p. 9, l. 11-15; p. 10, l. 2-17.

In late February 2007, the senior management at Post decided that one of the field admissions representative positions must be cut; and  Lizotte was directed to determine which representative should be terminated.  *Id.*, p. 56, l. 9 to p. 57, l. 8, & l.  17-22. Lizotte thus testified that he was informed that henceforth Post would have only two field admissions positions due to budgetary cuts.[32]  He was instructed to eliminate one position.  *Id.*, p. 55, l. 22 to p. 57, l. 16.  In addition to the field position, Post also eliminated an enrollment coordinator position and a data entry position.[33]  Post thus eliminated a total of three "admissions or enrollment" positions at the same time.  *Id.*, p.

---

[30]It is likely that Lizotte said or intended to say "draconian" rather than "Jacobean" cuts. The question is not material because in either event, Lizotte's intended meaning that the cuts were harsh is clear.  Lizotte Dep., p. 44, l. 6-12.

[31]Post  planned to hire a Director of Admissions instead of hiring another Vice President of Enrollment Management.  Lizotte Depo.,  p. 44, l. 13-22.

[32]According to Lizotte, the decision to eliminate one field position was a "consensus decision between the President, the Vice President of Finance and Administration, and [the] CEO/Chancellor."  Lizotte Dep., p. 57, l. 17-22.  A budgetary spreadsheet then documented that the number of field admissions representative positions went from three to two.  *Id.*, p. 58, l. 4-13.

[33]According to Lizotte, the employees in the enrollment coordinator and data entry positions, Chandra Pitassi and Michelle Wall, respectively, were laid off at the same time that plaintiff was terminated.  Lizotte Dep., p. 59, l. 9-20.

59, l. 9-15.

Lizotte stated that, in deciding whom to terminate, he primarily examined the production rates of the employees and the amount of initiative being shown. *Id.*, p. 55, l. 22. In addition to his own knowledge of the field admissions employees, he considered evaluations and assessments by plaintiff's supervisors. For example, he requested that Ron Silva, as Director of Field Admissions and plaintiff's direct supervisor, prepare a memorandum, containing an assessment of plaintiff's performance of his duties.[34] *Id.*, Ex. M (Memorandum for Record from Silva to Lizotte, "Subject: Roderick Jackson," 5/25/2007); *see also* Lizotte Dep., p. 59, l. 21 to p. 60, l. 6.

### I. Silva's Assessment of Plaintiff's Performance - Memo dated 2/25/2007

In his memorandum, dated February 25, 2007, Silva described plaintiff's attitude during his first two weeks of Silva's supervision as "very resistant to any . . . instructions and guidelines" during training. Lizotte Dep., Ex. M, para. 2. "He seemed to be confrontational and overfly] sensitive on many occasions when discussing the team's work policies and procedures." *Id.* Next, Silva documented plaintiff's failure to attend a mandatory work session with Marrero on Nov. 17,

---

[34]Shortly before requesting the assessment, Lizotte recalled a meeting he called with Silva, Swerzenski, and plaintiff to discuss how to incorporate recruiting for a military program into field admissions. Lizotte Dep., p. 62, l. 12 to p. 63, l. 3. At the meeting, Swerzenksi was attentive, offering various ideas, while plaintiff spent much of the time "on his Motorola phone." *Id.* Lizotte observed that Silva became "pretty upset" that plaintiff did not give his full attention to the meeting. *Id.* Lizotte believed that Silva's perspective was "the boss is here, let's give him our full attention." *Id.*, l. 22-24. After the meeting, Lizotte decided to request an assessment of plaintiff's performance. *Id.*, p. 63, l. 5-8. Lizotte did not request an assessment of Swerzenski because, as he stated before being cut off by the questioning attorney, "Jared was still fairly — ." *Id.*, l. 9-12. Perhaps Lizotte was going to say "new in his position," since Swerzenski had only been in his position for less than six months at that time. The Court will not, however, speculate as to Lizotte's reasoning and further notes that there is nothing in the record to suggest problems with Swerzenski's attitude or job performance.

2006. *Id.*, para. 3. Silva stated that plaintiff "did not even call to say why," ironically after having insisted on receiving a special Outlook invitation. Rather, on the day of the meeting, Jackson called the "front desk representative . . . to say he had put in for a personal day." *Id.* Silva concluded that Jackson's behavior with respect to this meeting was "unprofessional and negligent." *Id.*

Silva then described a training session he held on Nov. 29, 2006, with plaintiff and Swerzenski. Silva stated that he instructed his team on the proper use of their Post AMEX credit cards, "looking out for [them] . . . regarding making bad decisions for card use." *Id.*, p. 2, para. 1. Silva noted, "Rod was offended and without my knowledge went to Dominick [Miciotta] to discuss my warnings on fraudulent use of the card." *Id.*

Silva went on to discuss the "personal day" incident regarding the mandatory meeting with Post's President on February 21, 2007. Silva wrote that he called plaintiff on February 14 to inform him of a "very important meeting for the Admissions Staff being held by Ed Lizotte on 21 February, 2007." *Id.*, para. 2. Silva was unable to reach plaintiff and thus left him a voicemail. *Id.* Plaintiff allegedly responded by saying that "he had that day off." *Id.* Silva replied that he had no formal record of such a day; and Jackson "responded by saying that he had mentioned it to [Silva] 2 weeks ago but forgot to give [him] the request." *Id.* Silva ultimately received the formal request and spoke to Lizotte "over the weekend." *Id.* Silva then documented that "[a]gain I spoke to Rod [Jackson] about planning ahead and being prompt on requests," suggesting that, in essence, plaintiff should have planned ahead so as not to miss the meeting or, at the very least, have promptly turned in his personal day request. *Id.*

Finally, Silva recounted his disappointment "[l]ast week [when he] called Rod to check in on his progress and his plan for the week." *Id.*, para. 3. When Silva asked plaintiff about his "back-

up plan" to get work done on a day when it was snowing, plaintiff had no such plan, merely stating, that "all the schools were closed." *Id.* Similarly, plaintiff could not describe to Silva what he had planned for the week because he "couldn't find his planner." *Id.*

Silva concluded that he had "concerns regarding some of the issues and observations" stated in the memo. *Id.*, para. 4. He closed by stating, "Rod at times seems to be detached from the real sense of the mission at hand and lacks the drive to be a self starter."[35] *Id.*

### J.   March 2, 2007 - Plaintiff's termination

On March 2, 2007, Lizotte informed plaintiff that his employment was terminated in a meeting at Lizotte's Interim Director of Admissions office. Lizotte Dep., p. 63, l. 16-22. Lizotte described the encounter as follows:

> I said that a decision was made to eliminate a position and I need to have people who believe in what we're doing, who are attentive to what we're doing and have the drive, determination and initiative to be able to get out there and do those things that are being required of them. I told him, I said, [t]o me it's obvious – it doesn't seem like you want to be here anymore. You blew off the meeting that the president asked me to call. I understand you had a personal day, but if it was me, I would have changed the personal day, unless it was something, you know, absolutely positively necessary.

Lizotte Dep*.*, p. 64, l. 17 to p. 65, l. 4.

At this meeting, Lizotte went through a series of issues with plaintiff's performance, including plaintiff being "upset" with being supervised by Silva, not accounting for his time in the field and/or not being a "self-motivator," *e.g.*, not making recruiting calls from home when Post is

---

[35]Lizotte testified that between June and August of 2006, Miciotta also began to question whether plaintiff had the ability to perform adequately as a field person. Lizotte Dep., p. 47, l. 6-24. According to Lizotte, Miciotta expressed that "Rod Jackson maybe didn't have the skills necessary for a field position." *Id.*

closed.[36]  *Id.*, p. 65, l. 5 to p. 66, l. 4.   Despite these discussions regarding performance, Lizotte

indicated on plaintiff's "Unemployment Notice," provided at the time of separation, that the sole

"reason for unemployment" was "Position Elimination/Re-Structure."[37]  *See* Lizotte Dep., Ex. N

("Unemployment Notice  re: Roderick Jackson," signed by Lizotte on 3/2/2007).

In April or May of 2007, an admissions position opened up at Post.  The position was

entitled, "day admissions representative."  Lizotte Dep., p. 69, l. 25.    Lizotte phoned and rehired

Randy Sanders, an African-American who had previously worked in the admissions department.

*Id.*, p. 68, l. 7 to p. 69, l. 21.  Sanders was familiar with the University, "knew the systems, was a

proven entity or commodity with regards to bringing in enrollments."  *Id.*, l. 3-7.  "He had left the

university for personal reasons."  *Id.*, l. 7-8.

According to Lizotte, the position was created as a "backfill" for Michelle Salvador, an

admissions department employee who was about to go out on maternity leave.  *Id.*, p. 68, l. 16 to p.

69, l. 25.  Lizotte said that, due to the timing of Salvador's prospective leave, he needed an "overlap

of time so that [Sanders could] transition Michelle's workload and caseload."  *Id.*, l. 12-16.  Lizotte

obtained the board's approval to hire Sanders right away.  *Id.*, l. 16-21.  There is no indication in the

record whether the day admissions position in any way replaced the field admissions representative

---

[36]Lizotte testified that he told plaintiff that, from his estimation, plaintiff was "pretty
upset with the fact that Silva was supervising him now."  Lizotte Dep., p. 65, l. 5-11.  Silva
expected plaintiff to account for his time as a field position, be self-motivated, and inform him in
advance of plaintiff's "game plan" for the week. *Id.*, p. 65, l. 11 to p. 66, l. 12.  According to
Lizotte, unlike Swerzenski, plaintiff gave Silva no details of a game plan and would cease
making recruiting calls from the field when the University was closed.  *Id.*

[37]Plaintiff responded to Lizotte by becoming "upset."  *Id.*, p. 66, l. 14-15.  Specifically, he
did not like the way he was being terminated without prior notice.  *Id.*, l. 14-22.

position formerly held by, or encompassed the duties once performed by, plaintiff.

## IV. **DISCUSSION**

### A. **Standards for Summary Judgment**

I begin this Discussion with the observation that most, if not all, pre-trial discovery has been completed. The individuals central to the case, plaintiff Jackson and the key Post administrator Lizotte, have been deposed. It would seem that all relevant documents have been produced by both parties. It is generally held that in fact-intensive cases such as this one, a trial court should not entertain or adjudicate motions by either party for summary judgment until all discovery has been completed. *See, e.g., Hellstrom v. U.S. Dept. Of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000): "[S]ummary judgment should only be granted if *after all discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of

proof. . . . Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." (citations and internal quotation marks omitted; emphasis in original). In the case at bar, the voluminous record created by discovery allows the Court to consider the merits of Post's motion for summary judgment dismissing Jackson's complaint.

The criteria for granting or denying summary judgment are well established. The district court may not resolve issues of fact, but rather "must determine (a) whether there is a 'genuine issue as to any material fact,' and (b) whether, in light of the undisputed facts, 'the movant is entitled to judgment as a matter of law.'" *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010)

(quoting Fed. R. Civ. P. 56(a)). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986));

*O'Hara v. Nat'l Union Fire Ins. Co.*, No. 10-1433-cv, 2011 U.S. App. LEXIS 7675, *12-13 (2d Cir.

Apr. 14, 2011) *; Kuebel v. Black & Decker Inc.*, No. 10-2273-cv, 2011 U.S. App. LEXIS 9448, at

*14 (2d Cir. May 5, 2011).[38]

Summary judgment is proper when, after drawing all reasonable inferences in favor of the

non-movant, no reasonable trier of fact could find in favor of that party.  *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  It thus follows that "[s]ummary judgment

is improper if there is any evidence in the record that could reasonably support the jury's verdict for

the non-moving party.'"  *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) (quoting *Marvel*

*Characters v. Simon*, 310 F.3d 280, 285-86 (2d Cir.2002)).

The party who seeks summary judgment bears the burden of showing that he or she is

entitled to it, on the facts and the law.  *Anderson*, 477 U.S. at 256.  Specifically, the moving party

must establish that there exists no genuine issue of material fact to warrant a trial, and that movant

"is entitled to judgment as a matter of law."  Rule 56(c)(2); *see, e.g., Ford*, 316 F.3d at 354;

*Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005) ; *Gummo v. Village of Depew*, 75 F.3d 98,

107 (2d Cir. 1996); *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir.1995).  In

determining whether that burden has been met, the court is required to resolve all ambiguities and

credit all factual inferences that could be drawn in favor of the party against whom summary

---

[38]*See also Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006) (summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that "the moving party is entitled to judgment as a matter of law") (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)); *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).

judgment is sought. *Anderson*, 477 U.S. at 255.

"It is not the province of the court itself to decide what inferences should be drawn . . . ; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper . . . ." *Vivenzio,* 611 F.3d at 106 (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir.2000)).

Once the moving party has met his or her burden, the opposing party must present sufficient evidence to show that a fact-finder could reasonably find genuine issues of fact. There must be more than a "scintilla of evidence" in the non-movant's favor. *Anderson*, 477 U.S. at 252. Moreover, "conclusory allegations," "bald assertions," and "metaphysical doubt" will not suffice. *See, e.g., BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts"); *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 99 (2d Cir.2003) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.") ((internal quotation marks omitted).[39] Rather, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87); *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (nonmoving party must set forth "concrete particulars" showing that a trial is needed).

---

[39]*See also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1983) ("Genuine issues of fact are not created by conclusory allegations."); *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ("defendants' bald assertion, completely unsupported by evidence, did not satisfy their burden" to overcome properly supported summary judgment motion)*; see also Matsushita Elec.*, 475 U.S. at 586 (to avoid summary judgment, a party "must do more than simply show that there is some metaphysical doubt as to the material facts").

If the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. Moreover, 'the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment." *Id.* at 247-48.

### B.     Standard for Federal Discrimination Claim - Section 1981

Plaintiff brings the present discrimination action against his former employer, alleging that Post unlawfully discharged him on the basis of his race and color in violation of 42 U.S.C. § 1981 ("Section 1981") and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60. Because federal law guides analysis of Connecticut's anti-discrimination statutes, including CFEPA, *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103, 671 A.2d 349, 355 (1996), plaintiff's federal and state discrimination claims will be analyzed together.[40]

42 U.S.C. § 1981(a) provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a).[41]   The phrase "make and enforce contracts" is

---

[40]"Connecticut courts look to federal discrimination law for guidance in determining liability under CFEPA." *Burbank v. Office of Attorney Gen. of Connecticut*, 240 F. Supp.2d 167, 175 (D. Conn. 2003) (citing *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 671 A.2d 349, 355 (1996) and *State v. Comm'n on Human Rights & Opportunities*, 211 Conn. 464, 559 A.2d 1120 (1989)).   Therefore, I will examine the standard of law applicable to plaintiff's Section 1981 claim to determine whether to grant summary judgment as to both plaintiff's federal discrimination claim and his state CFEPA claim. *Burbank*, 240 F. Supp.2d at 175 (citing *Levy*, [236 Conn. at 106-07], 671 A.2d at 357, and applying Supreme Court's *McDonnell Douglas* framework to grant summary judgment as to plaintiff's federal discrimination claim under Title VII and thus as to his CFEPA claims as well).

[41]For full statutory text of 42 U.S.C. § 1981, *see* n.1, *supra.*

defined in 42 U.S.C. § 1981(b) to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." "Accordingly, it is now well established that an employee may sue his employer under 42 U.S.C. § 1981 for racially discriminatory termination." *Anderson v. Hertz Corp.*, 507 F. Supp.2d 320, 326 (S.D.N.Y. 2007) (citing *Lauture v. Int'l Bus. Mach. Corp.*, 216 F.3d 258, 260 (2d Cir.2000)). *See also Johnson v. Railway Express Co.*, 421 U.S. 454, 459-460 (1975) ("§1981 affords a federal remedy against discrimination in private employment on the basis of race").

To establish a claim under Section 1981, the plaintiff must show that (1) he is a member of a racial minority group, (2) defendant intended to discriminate against him on the basis of race, and (3) this discrimination concerned one of the activities enumerated in 42 U.S.C. § 1981. *Jenkins v. NYC Transit Authority*, 201 F. App'x 44, 45-46 (2d Cir. Oct. 18, 2006) (*citing Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (*per curiam*)). *Accord Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1481 (S.D. Fla.1987), *aff'd,* 865 F.2d 1272 (11th Cir.1988), *cert. denied*, 493 U.S. 812 (1989).

"A plaintiff's efforts to establish the second element of a § 1981 claim [*i.e.*, to establish defendant's discriminatory intent] are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq*." *Jenkins*, 201 F. App'x at 45-46 (citing *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d Cir.1999)). Specifically, the Second Circuit assesses Section 1981 claims under the familiar burden-shifting framework articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See, e.g.*, *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (applying *McDonnell Douglas* analysis to section 1981 claim because

*"*[t]he substantive standards applicable to claims of employment discrimination under Title VII . . . are also generally applicable to claims of employment discrimination brought under § 1981").[42]  *See also Anderson v. Hertz Corp.,* 507 F. Supp.2d 320, 326-27 (S.D.N.Y. 2007) ("Although it was initially established for Title VII claims, the burden-shifting framework described in *McDonnell Douglas . . .* also applies to claims arising under § 1981) (citing *Hudson v. Int''l Bus. Mach. Corp.*, 620 F.2d 351, 354 (2d Cir.1980)).

  "Under *McDonnell Douglas*, a plaintiff must first make out a prima facie case [by demonstrating] the following: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'" *U.S. v. Brennan*, 650 F.3d 65, 93 (2d Cir. May 5, 2011)[43] (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir.2009)); *accord Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir.2010).

Once the plaintiff has established a prima facie showing of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802; *United States v. Brennan*, 2011 WL 1679850, at *20.  *Accord Vivenzio*, 611 F.3d at 106.   The defendant "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor*

---

[42]For application of the *McDonnell Douglas* framework to Title VII cases, *see, e.g.*, *Hongyan Lu v. Chase Inv. Services Corp.*, No. 10-208-cv, 2011 WL 782226, at *2 (2d Cir. Mar. 8, 2011); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000).

[43]Docket Nos. 08–5171–cv (L), 08–5172–cv (XAP), 08–5173–cv (XAP), 08–5375–cv (XAP), 08–5149–cv (CON), 08–4639–cv (CON).

*Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) ("*Hicks*") (internal quotation marks omitted; emphasis in original). *Accord Hongyan Lu v. Chase Inv. Services Corp.*, No. 10-208-cv, 2011 WL 782226, at *2 (2d Cir. Mar. 8, 2011); *Bernard v. JP Morgan Chase Bank NA*, No. 10–0710–cv, 2011 WL 326513, at * 2 (2d Cir. Feb. 3, 2011).

If the employer articulates such a nondiscriminatory reason, "[t]he burden then shifts back to the plaintiff 'to show that [the defendant's] stated reason for [the adverse employment action] was in fact pretext.'" *Brennan*, 650 F.3d at 93(quoting *McDonnell Douglas*, 411 U.S. at 804); *accord Vivenzio*, 611 F.3d at 106; *Leibowitz*, 584 F.3d at 499.[44] Specifically, the plaintiff "is given an opportunity to adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation." *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir. 2000); *accord Vivenzio*, 611 F.3d at 106.[45]

---

[44]*See also Jaiyeola v. Carrier Corp.*, 350 F. App'x 583, 585 (2d Cir. 2009) ("Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.") (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)).

[45]As the Second Circuit explained in *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305 (2d Cir. 1997):

> Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of producing, "'through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 2747, 125 L. Ed.2d 407 (1993) . . .

> In order to defeat summary judgment after such a showing by the defendant, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Vivenzio*, 611 F.3d at 106; *Hargett v. Nat'l Westminster Bank, USA*, 78 F.3d 836, 838  (2d Cir. 1996).  Moreover, "a reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515 (emphasis in original); *accord Hongyan Lu*, 412 F. App'x  at 162.

### C.  <u>Application of These Standards and Criteria to the Evidence in This Case</u>

On the record in this case, it is undisputed that plaintiff has met his evidentiary burden with respect to the first and third *McDonnell Douglas* elements.  Specifically, as a black African-American Mr. Jackson is a  member of a racial minority group, whose employment contract was terminated on March 2, 2007, within the statutory meaning of 42 U.S.C. § 1981(b).

With respect to the second element – *i.e.*, that plaintiff was qualified for his position – plaintiff "need not demonstrate that his performance was flawless or superior." *De la Cruz v. New York City Human Resources Admin. Dept. of Soc. Services*, 82 F.3d 16, 21 (2d Cir. 1996).  "Rather, he need only demonstrate that he 'possesses the basic skills necessary for performance of [the] job.'" *Id.* (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978), *cert. denied*, 439 U.S. 984 (1978)); *see also Owens v. New York City Housing Authority*, 934 F.2d 405, 409 (2d Cir. 1991) ("*McDonnell Douglas*  requires only a minimal showing of qualification to establish a prima facie claim").

---

131 F.3d at 312 (citations omitted).  *Accord Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996);  *Hongyan Lu*, 412 F. App'x  at  415-16.

The record reflects that, although Jackson had no college recruitment experience, plaintiff possessed a background in sales, which was considered by Post to be useful in plaintiff's position. Lizotte Dep., p. 17, l. 17 to p. 18, l. 6.   Moreover, despite expressions of concern at various times by his supervisors, Miciotta, Marrero, Silva, and Lizotte, regarding plaintiff's disinterested attitude toward his position, plaintiff was never officially disciplined during his employment.  Viewing the facts in the light most favorable to plaintiff, it is thus plausible to conclude that he was at the very least minimally "qualified" for his position: this element requires no more.

As to the fourth element, whether plaintiff's termination arose under circumstances which give rise to an inference of discrimination, the record is more complex.  It is clear enough that at the pertinent times, Post was undergoing internal financial reassessments and some reductions in its work force.  In cases involving a reduction in force, the inquiry as to whether discharge occurred under circumstances giving rise to an inference of discrimination is highly fact specific.  *Burger v. New York Inst. of Tech.*, 94 F.3d 830, 833 (2d Cir. 1996).  The "[s]imilarity of jobs" between the employee discharged and the employees retained thereafter is one of several non-dispositive factors to be considered.  *Id.* at 834.

In the case at bar, plaintiff was informed that his position of field admissions representative was being eliminated due to budgetary problems, yet two fellow Caucasian employees retained their jobs in field admissions.   Swerzenski, in particular, had less seniority with Post but retained a position with the same title and duties as plaintiff.  Because plaintiff was the only African American in the field admissions department and was the one chosen for discharge, one might find "circumstances giving rise to an inference of discrimination."

Assuming *arguendo* that Jackson has met this less demanding standard of showing

-33-

circumstances leading to a plausible inference of discrimination, it does not follow that Post is barred from summary relief. The burden of proof simply shifts to the defendant to present evidence of a nondiscriminatory reason for the termination. In the present case, defendant has clearly met that burden. Lizotte testified that in late February of 2007, the senior management at Post decided that one field admissions representative position must be cut due to the University's budget. Lizotte was directed to determine which representative should be terminated. Lizotte Dep., p. 56, l. 9 to p. 57, l. 8, & l. 17-22. In making the decision of whom to discharge, he examined and compared the production rates and the level of initiative being shown by the field admissions employees.[46] *Id.*, p. 55, l. 16-22.

As one source of information, Lizotte reviewed an assessment of plaintiff's performance by Silva, plaintiff's direct supervisor.[47] In that memorandum, Silva documented a list of situations in which plaintiff had exhibited problems with his attitude (describing him, for example, as "very resistant" to instructions, "confrontational," "overfly] sensitive," and lacking a sufficient work plan).

---

[46]Lizotte did not describe in detail his assessment of the performance of Silva or Swerzenksi. It is clear, however, that he had an extremely favorable impression of Silva's recruitment abilities. Throughout his testimony regarding Silva, then Director of Field Admissions, Lizotte uniformly praised Silva for both his recruiting and management skills. Lizotte personally recommended that Miciotta hire Silva, based on past experience when Silva had been one of his key area recruiter supervisors in the National Guard. Lizotte Dep., p. 38, l. 4-5, 11-25. It is thus likely that, in determining which field admissions employee to discharge, Lizotte focused his analysis on plaintiff and Swerzenski, who had been employed by Post for only approximately four months but who had appeared attentive and enthusiastic in his position. *See, e.g., id.*, p. 62, l. 12 to p. 63, l. 3.

[47]Plaintiff has suggested that racial discrimination may be directly inferred from the fact that Lizotte requested Silva to write a memorandum about plaintiff's performance but not a comparable memorandum about Swerzenski. Lizotte, however, did not base his decision to terminate plaintiff solely on this memorandum. He used evaluations of other supervisors and his own experiences with the field admissions employees to make his decision. *See* n. 50, *infra.*

Lizotte Dep., Ex. M (Memorandum for Record from Ron Silva, Director of Field Admissions, to Ed Lizotte, dated 2/25/2007). Silva concluded, "Rod [Jackson] at times seems to be detached from the real sense of the mission at hand and lacks the drive to be a self starter." *Id.*, p. 2, para.4.[48]

Lizotte also took into account previous evaluations of plaintiff by Marrero and Miciotta. For example, Marrero stated that plaintiff had exhibited a negative attitude regarding changes in his job duties (*i.e.*, incorporating online enrollment) in June of 2006. *Id.*, Ex. F (Email form Marrero to Miciotta, cc: Lizotte, dated 6/12/2006, stating that "[d]uring training, Rod seemed very indifferent and honestly un-interested"). Lizotte further noted that from June to August of 2006, Miciotta had expressed concerns about whether plaintiff had the skills necessary to perform adequately as a field person. Lizotte Dep., p. 47, l. 6-24.[49]

As an additional factor in his analysis, Lizotte credited his *own observations* of plaintiff's lack of initiative, such as plaintiff's choice to take a personal day rather than attend a mandatory meeting with the President of Post on February 21, 2007. *Id.*, p. 55, l. 16-22. Lizotte recalled with frustration that plaintiff had scheduled a "personal day" for that date and notified him directly by

---

[48]In contrast to the problems he observed with plaintiff, Lizotte noted the positive attitude of Swerzenski on the occasion of a meeting Lizotte held in 2007 with Silva, Swerzenski, and plaintiff to discuss how to incorporate recruiting for a military program into field admissions. Lizotte Dep., p. 62, l. 12 to p. 63, l. 3. Lizotte noted that during the meeting, Swerzenksi was attentive, offering various ideas, while plaintiff spent much of the time "on his Motorola phone." *Id.* Previously, Miciotta had praised Swerzenski for his impressive performance of a mock sales presentation during the interview process. *Id.*, p. 42, l. 24 to p. 43, l. 12. Lizotte noted that Swerzenski possessed the ability to overcome objections and close a sale. *Id.*

[49]Plaintiff himself testified that he voiced dissatisfaction regarding his June 2006 position to Miciotta, stating that he was "not hired for" online enrollment; he was "hired to be a field admission rep." Jackson Dep., p. 196, l. 2-9. Plaintiff specified that he did not want to work the phones because he was the type of salesman who is "successful in the field." *Id.*, p. 198, l. 18-23. *See also id.*, p. 216, l. 5-8 ("I just remember that I believe we had a conversation and I said, 'I don't feel comfortable doing the online thing. I'm a field guy.'").

email one day before the meeting. *See id*, p. 64, l. 17 to p. 65, l. 4 ("You blew off the meeting that the president asked me to call. I understand you had a personal day, but if it was me, I would have changed the personal day, unless it was something, you know, absolutely positively necessary."). Regardless of whether, as plaintiff contends, plaintiff performed the correct procedures to obtain such a personal day, Lizotte's firm belief that Jackson's taking such a day on the date of a mandatory meeting was inappropriate is apparent from the record and untainted by any discernible racial element.

In sum, through Lizotte's testimony, the defendant "has introduced evidence that, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason'" for plaintiff's discharge. *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)). Namely, economic cutbacks led to the termination of one field admissions position and Lizotte's analysis of employee performance and initiative led him to conclude that plaintiff was the least valuable employee in field admissions.[50] *See, e.g., Jaiyeola v. Carrier Corp.*, 350 F. App'x 583, 585 (2d Cir. 2009) (affirming summary judgment where employer's proffered reason for black male employee's termination, downsizing of department in which he was weakest performer, held to be legitimate, nondiscriminatory reason).

In its defense, Post further contends that under the "same actor" inference, it is entitled to the benefit of a strong presumption that it lacked any discriminatory intent toward plaintiff.[51] Post

_____

[50]Plaintiff, in fact, concedes that Post's economic problems dictated the discharge of an employee but argues that choosing him was based on his race. Doc. #26, ¶¶ A.41-42.

[51]As stated *supra*, defendant Post seeks summary judgment on both counts of plaintiff's Complaint on the grounds that indisputable evidence reflects the "unquestionable absence of any racial bias in [the] decision" to terminate plaintiff's employment. Doc. #21, p. 5. In particular, Post argues that there is no evidence of racial animus, Post is entitled to the "same actor

-36-

maintains that it is entitled to this presumption because Lizotte, the person who made the decision

to terminate plaintiff in March of 2007, is the "same actor" who recruited him less than one year

earlier.

### D. "Same Actor" Inference

In support of its motion for summary judgment, Post asserts that plaintiff's claim of racial

bias "falls squarely within the 'same actor' rule, which entitles Post to a strong inference of non-

discrimination." Doc. #21, p. 17, para. 1. The "same actor inference" is generally applied in the

context of claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. § 621,

*et seq.*, and provides that when the same actor hires and also fires a person in a protected class, there

is a presumption against an inference of discrimination. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d

553, 560 (2d Cir.1997).[52]

As the Second Circuit explained in *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 132

(2d Cir. 2000), *cert. denied*, 530 U.S. 1261 (2000):

> The premise underlying this inference is that if the person who fires an employee is
> the same person that hired him, one cannot logically impute to that person an
> invidious intent to discriminate against the employee. Such an inference is strong
> where the time elapsed between the events of hiring and firing is brief.

*Accord Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir.2003) ("when the person who made the

decision to fire was the same person who made the decision to hire, especially when the firing

_____

inference," and there is no evidence of pretext. *Id.*, p. 11-14.

[52]*See also Renz v. Grey Advertising*, 135 F.3d 217, 224 (2d Cir. 1997) (erroneous jury instruction requiring that age was the "real reason" for discharge did not prejudice plaintiff where allegedly biased supervisor was the same individual who had promoted her less than two years previously).

occurred only a short time after the hiring, it is difficult to impute [to the decisionmaker] an invidious firing motivation that would be inconsistent with [the] decision to hire.").[53]

Likely due to the commonality of discrimination in both civil rights and ADEA claims, the Second Circuit has also "recognized the validity of the] 'same actor' argument" in the context of a Section 1981 claim. *See Kim v. Dial Service Intern., Inc.*, 159 F.3d 1347, 1998 WL 514297 (Table), at *4 (2d Cir. 1998) (citing *Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir.1997), to acknowledge the validity of the same actor doctrine but holding that lack of a jury instruction on this issue did not prejudice defendants under the circumstances, "inasmuch as over six years had passed between the time plaintiff was hired and the time he was fired"). *See also Portee v. Deutsche Bank*, No. 03 Civ. 9380(PKC), 2006 WL 559448, *6, *11n.3, 2006 U.S. Dist. LEXIS 9153, *33 (S.D.N.Y. Mar. 8, 2006) (noting that discrimination "[c]laims under section 1981 are analyzed under the same framework as claims brought pursuant to Title VII" and applying "same actor" inference in the context of § 1981 claim); *Anderson v. Hertz Corp.*, 507 F. Supp.2d 320, 329-30 (S.D.N.Y. 2007) (applying "same actor" inference in § 1981 action for race discrimination to "cast doubt on any potential inference of invidious discrimination in Plaintiff's termination");

_____

[53]*See also Ramos v. Marriott Int'l*, 134 F. Supp.2d 328, 345 (S.D.N.Y.2001) ("The underlying rationale for the time limitation is that it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class.") (internal quotations omitted); *Watt v. New York Botanical Garden*, No. 98 Civ. 1095(BSJ), 2000 WL 193626, at *7 (S.D.N.Y. Feb. 16, 2000) (same) (quoting *Ruane v. Continental Cas. Corp.*, No. 96 Civ. 7153, 1998 WL 292103, *7 (S.D.N.Y. June 3, 1998)); *Dedyo v. Baker Eng'g New York, Inc.*, No. 96 CIV. 7152(LBS), 1998 WL 9376, * 7 (S.D.N.Y. Jan. 13, 1998) ("'[C]laims that employer animus exists in termination but not in hiring seem irrational.' From the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.'") (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991)).

*Richards v. Calvet*, No. 99 Civ.12172 (RJH)(MHD), 2005 WL 743251, at *4-5 (S.D.N.Y. Mar. 31, 2005) (examining "same actor defense" in discrimination action brought under, *inter alia*, ADEA and § 1981 to hold that summary judgment was inappropriate because there existed a genuine issue of material fact with respect to who hired plaintiff).

### 1.    Length of Time Between Hire and Discharge

Following the Second Circuit precedent of *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997), district courts within the Circuit explicitly recognize that "[t]he same actor inference applies with greatest force where the act of hiring and firing are not significantly separated in time." *Choate v. Transp. Logistics Corp.*, 234 F. Supp.2d 125, 130-31 (D. Conn. 2002). "Conversely, when a longer period of time elapses between the hiring and firing, the inference is 'less compelling' and 'significantly weaken[ed].'" *Id.* (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 138 (2d Cir. 2000), *cert. denied*, 530 U.S. 1261 (2000) (seven year time lapse)).

In practical terms, district courts have frequently applied the same actor inference when the hiring and firing of the claimant have both occurred within a three-year period. *See, e.g., Schnabel v. Abramson,* 232 F.3d 83, 91 (2d Cir. 2000) (applying inference when hiring and firing three years apart); *Shabazz-Allah v. Guard Mgmt. Serv.*, No. 97 Civ. 8194, 1999 WL 123641, at *4 (S.D.N.Y. March 8, 1999) ("within two years"), *aff'd,* No. 99-7371, 1999 WL 1012402, at *1 (2d Cir. Oct.20, 1999); *McKinney v. Lanier Worldwide, Inc.*, No. 94 Civ. 8139, 1998 WL 677544, at *2, 5 (S.D.N.Y. Sept. 29, 1998) (two years and four months); *Dedyo v. Baker Eng'g N.Y., Inc.*, No. 96 Civ. 7152, 1998 WL 9376, at *7 (S.D.N.Y. Jan.13, 1998) ("a mere three years").[54]

---

[54]More recently, decisions of the Southern District of New York have moved in the direction of applying the same actor inference when the time lapse between hiring and firing is

Within this District, the three-year period of *Schnabel* has been noted as a reference point. *Choate v. Transp. Logistics Corp.*, 234 F.Supp.2d 125, 130-31 (D. Conn. 2002) (finding a strong inference that discrimination was not a motivating factor in plaintiff's termination where termination took place eighteen months after he was hired; noting that "the Second Circuit has applied the inference [in *Schnabel*, 232 F.3d at 91 ] even where the hiring and firing occurred three years apart").

In the case at bar, it is undisputed that plaintiff was employed by Post from April 17, 2006, to March 2, 2007, a period of approximately ten and one-half months. This relatively short duration of time between hiring and discharge falls squarely within the period contemplated by the "same actor" inference. It is also undisputed that Lizotte is the person who made the decision to discharge plaintiff in March of 2007. The remaining issue is thus whether Lizotte may be deemed an actor who hired plaintiff.

---

"less than two years." *See, e.g., Thomas v. iStar Financial, Inc.*, 438 F. Supp.2d 348, 361 (S.D.N.Y. 2006) ("In the Second Circuit, the inference no longer applies when more than two years separate the hiring and firing."); *Ramos v. Marriott Int'l*, 134 F. Supp.2d 328, 345-46 (S.D.N.Y. 2001). ("This [same actor] inference remains significant where the time period between the hiring and firing is less than two years."); *Campbell v. Alliance Nat'l Inc*., 107 F. Supp.2d 234, 248-49 (S.D.N.Y. 2000) (same actor inference applied where employee hired and terminated within nine months); *Lenhoff v. Getty*, No. 97 Civ. 9458, 2000 WL 977900, at *5 (S.D.N.Y. July 17, 2000) (eleven months between hire date and termination); *Irvine v. Video Monitoring Servs. of America*, L.P., No. 98 Civ. 8725, 2000 WL 502863, at *1, 8 (S.D.N.Y. Apr.27, 2000) (termination fourteen months after date of hire).

However, the Second Circuit has not delineated a set time period after which the same actor inference does not apply. As set forth *supra*, the Second Circuit applied the inference when the employee was terminated within three years. *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000). Seven years, however, were deemed to have "significantly weaken[ed]" the inference. *Carlton v. Mystic Trans., Inc.*, 202 F.3d 129, 138 (2d Cir.), *cert. denied*, 530 U.S. 1261 (2000).

The question is interesting but need not be further pursued because, in any event, plaintiff was terminated within ten and a half months after he was hired, a time frame well within either the Southern District of New York's suggested two-year or the *Schnabel* three-year period.

## 2.    **Identity of Person who Hired and Fired**

In order for the presumption against discriminatory intent to arise under the same actor doctrine, the defendant must establish the identity of the person or persons who made the decision to hire and then later to discharge the plaintiff.    The involvement of multiple decision-makers in either the hiring or  termination decision does not automatically preclude application of the same actor inference. *See Jones v. Yonkers Pub. Schools*, 326 F. Supp.2d 536, 546 (S.D.N.Y.2004) ("the [same actor] inference may be applied even when the supervisor at issue . . .  is not the only person with input into the hiring and firing decision. The inference 'is applicable so long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff.'") (quoting *Ramos v. Marriott Int'l*, 134 F. Supp.2d 328, 346 (S.D.N.Y.2001)); *accord Thomas v. iStar Financial, Inc.*, 438 F. Supp.2d 348, 361-62 (S.D.N.Y. 2006).

From the record, it is undisputed that Lizottte ultimately made the decision to terminate plaintiff.   It is thus incumbent on the Court to determine whether Lizotte also played a substantial role in hiring plaintiff.  Upon careful review of the evidence presented, I find that he did.

Defendant Post established, and plaintiff concedes, that Lizotte recruited plaintiff at the March 2006 job fair for the position of field admissions representative. Lizotte Dep., p. 11, l. 21 to p. 12, l. 13;  Jackson Dep., p. 116, l. 22 to p. 117, p. 2.  Lizotte interviewed  plaintiff, reviewed his resume, and described the available position to him.  Lizotte Dep., p. 12, l. 9-10; *see also* Doc. #26, ¶ A.2. Upon forming a favorable opinion of plaintiff, Lizotte recommended plaintiff's application to Miciotta, who was Vice President of Enrollment Management.  Lizotte Dep., p. 12, l. 14-20; Jackson Dep., p. 121, l. 22 to p. 122, l. 3.    Miciotta then set up on-campus interviews, including interviews with Miciotta, Lizotte, and other members of Post's management.  Lizotte Dep., p. 12,

l. 14-20; Jackson Dep., p. 121, l. 22 to p. 122, l. 3; p. 126, l. 19-23; l. 153, l. 2-6; p. 154, l. 7-11; Doc. #26, ¶ A.4.  Thereafter, Miciotta made the decision to hire plaintiff.  Lizotte Dep., p. 16, l. 7-14.  Lizotte phoned plaintiff to offer him the position and plaintiff conveyed his acceptance to Lizotte.  Jackson Dep., p. 154, l. 19-24; p. 155, l. 7-20;  p. 159, l. 1-15.

Despite Lizotte's efforts in placing plaintiff's application before Miciotta, plaintiff contends that "Lizotte only had a limited role in the defendant's offer of employment to the plaintiff."  Doc. #25, p. 2, para. 2.  At his deposition, plaintiff emphasized his interactions with Cheryl Gatling, Post's Office Manager of Admissions, at the career fair, stating that he gave her his resume.[55]  Jackson Dep., p. 111, l. 9-16, p. 113, l. 17 to p. 114, l. 1.  Moreover, he argued that, "other than speaking generically with the plaintiff at the job fair regarding the field admissions representative position, Lizotte had no further role in the plaintiff's employment."[56]  Doc. #25, p. 2, para. 2.

Accepting *arguendo* the accuracy of Jackson's perception that Post administrators Gatling and Miciotta played major roles in hiring him, the end result of his hire does not negate Lizotte's involvement.  Plaintiff was not privy to the internal workings of Post's hiring process.  Specifically, he was not present when Lizotte discussed plaintiff's job application with Miciotta to set up an on-campus interview.[57]  *See, e.g.*, *Choate v. Transp. Logistics Corp.*, 234 F. Supp.2d 125,

---

[55]Plaintiff also, however, admitted that he spoke to Lizotte about the field admissions position at the fair.  Jackson Dep., p. 114, l. 7-13.

[56] "[A]fter Miciotta interviewed the plaintiff, Lizotte was told that the plaintiff was being hired by the defendant."  Doc. #25, p. 2, para. 2.    Miciotta was thus the person who "possessed the sole discretion in deciding whether to hire the plaintiff" and offered him the position with Post.  *Id.*, p. 1, para. 1.

[57]As Lizotte described at his deposition:

131 (D.Conn. 2002) (with respect to application of same actor inference, "[p]laintiff's view of hiring" was deemed "incomplete," "unsupported," and "conclusory" where he offered no basis for assertion that he was not hired by supervisor other than that he was not interviewed by him).[58]

Plaintiff contends in his brief at 2 that after their conversation at the job fair, "Lizotte had no further role in the plaintiff's employment with the defendant," an assertion that is belied by Lizotte's personal exchanges with Jackson about the taking of the problematic personal day, and in other respects is beyond the reach of plaintiff's personal knowledge about the Post administrators' internal discussions and conduct on the subject. To the extent that such contentions are not based on personal knowledge, they are unsupported and conclusory and the Court must disregard them.[59]

Not infrequently, an employer utilizes multiple actors to handle the various stages of the hiring process. In such a case, each actor plays an integral role in the applicant's ultimate hire yet the applicant is generally not privy to the discussions among the actors. Furthermore, the substantial involvement of one actor does not negate that of another.

---

So, from what I saw in the way Mr. Jackson presented himself, I was like, I think you [Miciotta] need to speak to this individual. An interview was conducted with Mr. Jackson and Dominick Miciotta shortly after that.

Lizotte Dep., p. 12, l. 16-20.

[58]*See Choate v. Transp. Logistics Corp.*, 234 F. Supp.2d 125, 131 (D.Conn. 2002) ("Application of the same actor inference is not necessarily determined by who did or did not conduct a hiring interview.").

[59] *See* Rule 56(e)(1): "A supporting or opposing affidavit must be made on personal knowledge, setting out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." In this case, I cannot credit plaintiff's testimony regarding what did not occur when he was hired because plaintiff possesses no direct knowledge of interactions solely between Lizotte and Miciotta regarding that decision.

The record indisputably reflects that Lizotte was one of Post's few interviewers at the March 2006 job fair at which plaintiff was recruited. "Lizotte noticed the Plaintiff and engaged him in conversation regarding his sales background and career objectives, as well as the field representative position." Doc. #22, ¶ 2; Doc. #26, ¶ A.2. The parties agree that "Lizotte discussed the Plaintiff with Dominick Miciotta, the University's Vice President of Enrollment Management, and arranged an interview." Doc.#22, ¶ 4, Doc. #26, ¶ A.4. "Miciotta then called the Plaintiff, discussed the Plaintiff's resume and scheduled an interview." Doc.#22, ¶ 5, Doc. #26, ¶ A.5. After the interview with Miciotta, which also included time spent with Post President DeTemple and Lizotte, "Lizotte and . . . Miciotta extended an employment offer to Plaintiff, despite his lack of college recruiting experience." Doc.#22, ¶ 6-8, Doc. #26, ¶ A.6-8; *see also* Jackson Dep., p. 126, l. 19-23; l. 153, l. 2-6; p. 154, l. 7-11. Shortly thereafter, "Lizotte called the Plaintiff with the employment offer, and followed up the call with an email and offer letter." Doc.#22, ¶ 9, Doc. #26, ¶ A.9.

In total, the evidence demonstrates that Lizotte's actions were integral to Post's hiring of plaintiff. Granted, Miciotta, as the direct supervisor of the newly created field admissions representative position, made the determinative decision to offer plaintiff employment. Nonetheless, Lizotte recruited plaintiff, recommended him to Miciotta, secured the necessary follow-up interviews on campus, and ultimately phoned him with the job offer. In contrast, plaintiff baldly denigrates Lizotte's participation without being privy to Lizotte's interactions with Miciotta behind the scenes, including discussions that led to Miciotta's on-campus interview of plaintiff.[60]

---

[60]Although out-of-court statements are often barred from consideration on a motion for summary judgment as inadmissible "hearsay" when offered for the truth of their contents, Fed. R. Evid. 801-02, Lizotte's "state of mind" in recommending plaintiff to Miciotta is relevant to his participation in the hiring process and may thus fall within a recognized exception to the hearsay rule, Fed. R. Evid. 803(3). Moreover, and in any event, the *fact* that discussions took place and

Considering the totality of evidence in the record and drawing all reasonable inferences in plaintiff's favor, the Court nonetheless finds that Lizotte played a substantial role in Post's hiring of plaintiff. Because Lizotte was also indisputably the person who terminated plaintiff less than eleven months later, the "same actor inference" arises – *i.e.*, that plaintiff's discharge was made without discriminatory animus.

This "same actor" finding does not, however, end the question. "[T]he same-actor inference is merely plausible and should not be used as a substitute for a thorough factual inquiry." *Ramos v. Marriott Int'l*, 134 F. Supp.2d 328, 345 (S.D.N.Y.2001) (citing *Copeland v. Rosen*, 38 F. Supp.2d 298, 305 (S.D.N.Y.1999)); *Watt v. New York Botanical Garden*, No. 98 Civ. 1095, 2000 WL 193626, at *7 (S.D.N.Y. Feb. 16, 2000)) (court must consider all evidence in the record as a whole because "application of the same actor inference is permissible – as opposed to required"). In other words, "[t]he 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand." *Copeland*, 38 F. Supp.2d at 305 .

It is thus incumbent on the Court to "examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of the employer." *Palmer-Williams v. Yale New Haven Hosp.*, No. 3:08cv1526 (JBA), 2011 WL 1226022, at *6-7 (D. Conn. Mar. 27, 2011) (quoting *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir.2001)). In other words, the Court must review all of the facts presented to

---

Lizotte's other actions with respect to the hiring process may clearly be considered.

determine whether there exists evidence of racial discrimination.[61]    Although direct evidence of

discrimination is not necessary, there must be sufficient circumstantial evidence for a jury to infer

the existence of discrimination.  *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998).  *Accord*

*Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008) ("Direct evidence of discrimination, 'a

smoking gun,' is typically unavailable . . .  It is well settled . . . that employment discrimination

plaintiffs are entitled to rely on circumstantial evidence."); *Lizardo v. Denny's Inc.*, 270 F.3d 94, (2d

Cir. 2001) ("a jury cannot infer discrimination from thin air").    The Court must therefore examine

whether plaintiff has presented evidence of racial animus.

### E.        Evidence of Racial Animus  –  Stray Remark

Because defendant has proffered a nondiscriminatory reason for plaintiff's discharge,

bolstered by the presumption of the "same actor" doctrine, the burden returns finally to plaintiff to

show that defendant's stated reason for his discharge was pretextual in that his termination was

directly related to his race.[62]    *See, e.g., Holcomb v. Iona College,* 521 F.3d 130,  138 (2d Cir.

---

[61]As stated in *Copeland v. Rosen*, 38 F. Supp.2d 298, 305 (S.D.N.Y.1999), a finding of the "same actor" inference is not dispositive.   "There are a variety of plausible explanations of such 'hire-fire' conduct that may support an inference of discriminatory animus.  For example, it is plausible that a supervisor who has not previously worked with members of a certain protected class would come to realize his or her animus toward individuals in that group only upon actually hiring and working with such persons."  *Id.*

[62]Plaintiff has conceded that Post was forced to lay off employees for economic reasons. To the extent that he attributes his termination to "mixed motives" (*i.e.*, economic layoffs and discrimination), he need not prove pretext.  "A plaintiff alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the 'impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation.'" *Holcomb v. Iona College,* 521 F.3d 130, 142 (2d Cir. 2008) (quoting *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir.1997)).  *See also Hargett v. Nat'l Westminister Bank, USA*, 78 F.3d 836, 840 (2d Cir. 1996) (in mixed motives employment discrimination case, evidence must show

2008)(once defendant has provided a nondiscriminatory reason for termination, plaintiff can no longer rely on his prima facie case, but may prevail if he can show that the employer's decision was in fact the result of discrimination). In particular, plaintiff must establish by a preponderance of the evidence that discrimination was a "substantial or motivating factor for the defendant's actions." *See, e..g.*, *Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir. 2001). In the absence of racial animus, there is no viable Section 1981 action.

In an attempt to prove racial animus, plaintiff points solely to one comment by his direct supervisor, Ron Silva, Director of Field Admissions, during a lunch at which Silva was attempting "to get to know" plaintiff "a little better" and plaintiff "was having an issue with [his] eye." Jackson Dep., p. 251, l. 13-15. According to plaintiff, Silva observed plaintiff's bloodshot eye and commented, "It must be the marijuana." *Id.*, p. 251, l. 13-25. Plaintiff then responded, "All black men don't smoke weed;" and "I don't smoke weed." *Id.*, p. 252, l. 2-4. Silva replied, "I'm just playing." *Id., l. 3-5.* Plaintiff conceded that Silva did not want him to be offended by the marijuana comment. *Id.*, p. 254, l. 11-15. Nonetheless plaintiff remained offended, concluding that Silva's remark reflected a well-known stereotype that African-Americans smoke marijuana. *Id.*, p. 252, l. 12-18; p. 254, l. 7-16; p. 254, l. 13-14.

From Silva's marijuana comment, plaintiff requests this Court to infer that Silva was racially biased against him. Specifically, plaintiff asks the Court to draw the inference that Silva believed that plaintiff smoked marijuana because he is African American.

Clearly Silva's remark was tasteless and derogatory, but it does not explicitly or specifically

---

that employment decision was "the product of a mixture of legitimate and illegitimate motives") (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 (1989)).

reference race. Rather, its meaning and intent remain subject to interpretation. For example, it is possible that Silva was implying that plaintiff has the personality of someone who would smoke marijuana, regardless of his race. In today's national culture, smoking marijuana cuts across all classes, divisions, and groupings, including those of race.

Alternatively, it is possible that Silva was merely making a crude attempt at humor (*i.e.*, merely "playing," as he claimed), with no intent to offend based on race or otherwise. Notably, plaintiff testified at his deposition that he believed that Silva was "just playing" because "apparently" Silva "did not want [him] to be offended." Jackson Dep., p. 254, l. 7-16. Similarly, plaintiff testified that Silva treated him "okay" when the two of them drove together to various schools to perform their recruiting duties, *id.*, p. 265, l. 1-11, and "as far as [he] was concerned," he and Silva "got along well together," *id.*, l. 12-15.

Moreover, even if one were to conclude that Silva's remark was indeed racially motivated, because plaintiff recounted only *one* such comment from Silva, the Court may consider whether Silva's statement may be regarded as a "stray remark."[63] As recently stated in *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110, 2011 WL 1086867, at *1 (2d Cir. Mar. 25, 2011), the Second Circuit has "long held that stray comments of this variety do not create an inference of discrimination." *See also Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir.1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case

---

[63]The Second Circuit has "described remarks as 'stray,' [when] the purpose of doing so was to recognize that all comments pertaining to a protected class are not equally probative of discrimination and to explain in generalized terms why the evidence in the particular case was not sufficient." *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115-16 (2d Cir. 2007). The Second Circuit clarified that it "did not mean to suggest that remarks should first be categorized either as stray or not stray and then disregarded if they fall into the stray category." *Id.* at 116.

of employment discrimination.").[64]

In *Dixon*, the plaintiff, a fifty-one year old woman of Jamaican origin, brought an employment discrimination action, based on age, race, and national origin, against her former employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ADEA, Section 1981, and New York state law.[65]   On summary judgment, the district court noted that plaintiff predicated all of her claims of discrimination on one comment by a co-worker at a meeting:   "[t]he only overt comment related to Dixon's age, race, or origin came from a co-worker, . . . who stated 'she can't believe that [defendant] could hire a black Jamaican woman at 48 years of age.'" *Dixon v. Inter'l Fed'n of Accountants*, No. 09 CV 2839 (HB), 2010 WL 1424007, at *4 (S.D.N.Y.  April 9, 2010).  The district court concluded that, "[s]tray remarks [un]related to Dixon's discharge or neutral remarks unrelated to her protected group status [were] insufficient to demonstrate that she was terminated for discriminatory reasons."  *Id*.   Accordingly, the district court entered summary judgment for the defendant.[66]

---

[64]*See also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination"); *Weichman v. Chubb & Son*, 552 F. Supp.2d 271 (D.Conn. 2008) (stray remarks of supervisor could not prove employment discrimination where "Plaintiff's evidence of age-based animus is that she overheard [her supervisor] on the telephone stating that 'older people' 'slow down' and 'should retire.' This single remark does not demonstrate that [the supervisor] terminated the Plaintiff because of her age.").

[65]Dixon asserted actions under N.Y. Exec. Law § 296, *et seq.;* New York City Human Rights Law ("NYCHRL"), N.Y.C.R.R. § 8–107.   She also brought common law claims for breach of contract and tortious interference with contract.

[66]The district court in *Dixon* described the alleged remark as lacking in sufficient probative value as follows:

The statement, while without question inartful, is at best ambiguous as to whether it met the test for discriminatory animus, was laudatory of the efforts to increase

-49-

On appeal the Second Circuit, affirming summary judgment in the employer's favor, reasoned:

> Although Dixon satisfies the first three criteria [for proving discriminatory treatment], she fails to produce any evidence that her termination occurred under circumstances suggesting discrimination. Indeed, *her entire employment discrimination claim is predicated on an isolated derogatory remark* made by Barrett, who played no role in Dixon's termination. *We have long held that stray comments of this variety do not create an inference of discrimination. See Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir.1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."). Even assuming arguendo that Dixon could establish a prima facie case, the record overwhelmingly demonstrates that IFAC had a legitimate, non-discriminatory reason for terminating Dixon—namely, her deficient work performance.

2011 WL 1086867, at *1 (emphasis added).

In the case at bar, plaintiff alleges that the derogatory comment regarding marijuana was indicative of racial bias by Silva. As plaintiff's direct supervisor, Silva was later asked to review plaintiff's performance as potential input for Lizotte's decision of whom to terminate. Doc. #26, p. 8, ¶ 43. Plaintiff thus argues that Silva's discriminatory animus resulted in a negative performance review that ultimately influenced Lizotte to terminate plaintiff.

This argument disregards the Second Circuit's rule that "all comments pertaining to a protected class are not equally probative of discrimination." *Tomassi v. Insignia Financial Group,*

---

workplace diversity, or had some other meaning. Indeed, Plaintiff claims the statement was made at a meeting with others present, yet she provided no evidence that any other person heard Barrett say it, much less that it was thought to be a negative comment. More importantly, there is no evidence to indicate that Barrett played any role whatsoever in the decision to terminate Plaintiff. *See Tomassi v. Insignia Fin. Group, Inc.* 478 F.3d 111, 115-16 (2d Cir.2007) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.").

2010 WL 1424007, at *4.

*Inc.*, 478 F.3d 111, 115 (2d Cir .2007). "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (quoting *Tomassi*, 478 F.3d at 115). "For example, remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." *Tomassi* (citing *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992) (labeling remarks as "stray" when made "in the workplace by persons who are not involved in the pertinent decision making process")).[67]

The Second Circuit recently noted with approval that "[t]he district courts in this circuit have developed a standardized approach for applying [the stray remarks concept] to individual cases." *Henry*, 616 F.3d at 150 . "In determining whether a remark is probative, [the district courts] have considered four factors: (1) who made the remark (*i.e*., a decision-maker, a supervisor, or a low-level co-worker);[68] (2) when the remark was made in relation to the employment decision at issue;[69] (3)

---

[67]*Cf. McInnis v. Town of Weston,* 375 F. Supp.2d 70, 83 (D. Conn. 2005) (genuine issue of material fact existed as to whether police chief's advisory comments to Board of Police Commissioners that the way to have good morale in the department would be to "get rid of the old guys and hire young ones" had direct influence on Board's decision to fail to promote plaintiff based on his age); *Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir.2001) (distinguishing "the stray remarks of a colleague" from discriminatory "comments [that he preferred a "younger and cheaper" replacement] made directly" and repeatedly to plaintiff by "immediate supervisor, who had enormous influence in the decision-making process" to demote her from her position).

[68]*See Fiore v. Fairfield Bd. of Educ.*, No. 3:07-cv-00926 (CFD), 2009 WL 2869523, at *7 (D. Conn. Sept. 1, 2009) (where derogatory remarks regarding plaintiff teacher's religion (*e.g.*, "Jesus freak," neurotic Christian," "get over your Catholic guilt" ) were made by school principal who was not the decision-maker with regard to non-renewal of plaintiff's employment, plaintiff failed to show that the decision-maker, the Board of Education, was "motivated by the

the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Id.* (citing, *inter alia*, *McInnis v. Town of Weston*, 375 F. Supp.2d 70, 83 (D. Conn. 2005)).

Examining these four factors, (1) the alleged remark regarding marijuana was made by Silva, a low-level supervisor who was not the ultimate decision-maker regarding discharge; (2) there is no indication that the remark was made near the time of plaintiff's discharge,[70] (3) a reasonable juror might easily interpret the content of the remark to be racially-neutral, albeit derogatory (*i.e.*, a suggestion that plaintiff's character was such that he was likely to smoke marijuana, regardless of his race);[71] and (4) the remark was made at lunch and not in relation to any decision-making process.

In sum, while Jackson was understandably offended by Silva's gratuitous and boorish remark, his proof falls well short of demonstrating that the remark was probative of racial

---

alleged discriminatory sentiment expressed" in those comments).

[69]"The temporal proximity of the remark to the adverse employment action may also be indicative of discriminatory intent." *Fiore v. Fairfield Bd. of Educ.*, No. 3:07-cv-00926 (CFD), 2009 WL 2869523, at *7 (D. Conn. Sept. 1, 2009) (citing *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162-63 (2d Cir.1998) (decision-makers' use of age-related remarks close to the time of plaintiff's discharge was a factor in determining discrimination).

[70]It is unknown when exactly the remark was made. Silva was hired in October or November of 2006 and plaintiff was terminated in early March of 2007. The remark was thus made within a time frame of 3-4 months.

[71]It is equally conceivable that Silva's comment, although insulting and tasteless, stemmed from a personal dislike for plaintiff that bore no connection to his race. As explained by the Second Circuit, "[t]he relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes *relating to the protected class*." *Tomassi*, 478 F.3d at 116 (emphasis added).

discrimination on Silva's part, let alone that of the senior Post administrators involved in plaintiff's termination. The identity of the speaker, the remote time from termination, the potential ambiguity of the remark, and the lunch-time context all fail to establish that Silva's stray statement bore a relation to Lizotte's decision to discharge plaintiff.

Furthermore, if one examines the contents of the memorandum Silva prepared to assess plaintiff's performance, one finds no evidence of racial animus. The memorandum, in large part, recounts incidents and attitudes previously described by plaintiff's other supervisors, Marrero, Miciotta and Lizotte, none of whom has been accused by plaintiff of exhibiting racial bias. Lizotte Dep., Ex. M. For example, Silva's memorandum describes the same "resistant" attitude toward instruction that was previously detailed by Marrero . *Id.*, para 2; *see also id.*, Ex. F., para. 2 ("During training, Rod seemed very indifferent and honestly un-interested."). Similarly, Silva recounts the incident in which plaintiff took a personal day on February 21, 2007, in a similar fashion as Lizotte in his deposition. Lizotte Dep., Ex. M, p. 2, para. 2; *see also id.*, Ex. L. Lastly, Silva's comments regarding plaintiff's lack of interest in his position mirror comments by Marrero ( Lizotte Dep., Ex. F, para. 3); statements plaintiff concedes he himself made to Miciotta (Jackson Dep., p. 196, l. 2-9); and concerns expressed by Miciotta and Lizotte throughout plaintiff's employment (*e.g.*, Lizotte Dep., p. 47, l. 6-24; p. 62, l. 12 to p. 63, l. 3; *see also id.*, Ex. E). Silva's memorandum is thus patently consistent with the views of plaintiff's other supervisors both in description and assessment of plaintiff's performance and attitude.

Having concluded that Silva's sole derogatory remark is insufficient evidence to establish racial discrimination, the Court must consider whether other facts in the record provide evidence

of racial animus toward plaintiff.[72]   After all, "when 'other indicia of discrimination are properly

presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they

bear a more ominous significance.'" *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir.1998).

*Accord Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (management

representative's numerous comments about the age of the pilot force, referring to them as

"contaminated" and "Bad Apples," when "viewed against the background of [defendant airline's]

all-consuming interest in the age and projected retirement rates" of pilots, "inescapably' led to

conclusion that defendant airline's "actions may indeed have been motivated by age-based animus.").

In the present case, plaintiff's sole evidentiary basis for racial discrimination is Silva's

remark.  While plaintiff in his testimony described his "gut feeling" that his job responsibilities were

changed because of his color, there is no objective evidence to support that wholly subjective

impression.  I do not question the sincerity of Mr. Jackson's sensibilities, but beliefs or feelings,

however sincerely held, cannot support an employee's claim of discrimination if there is no proof

or insufficient proof that the employer actually engaged in illegal discrimination; and unsupported

subjective impressions are not probative on that issue.  Other than Mr. Jackson's "gut feeling" based

on his race, and his interpretation of Silva's ambiguous "marijuana" remark, he has presented no

facts, circumstances, or indicia to prove illegal discrimination by Post.  Rather, plaintiff repeatedly

---

[72]*See, e.g.*,  *Watt v. New York Botanical Garden*, No. 98 Civ. 1095, 2000 WL 193626, at
*7 (S.D.N.Y. Feb. 16, 2000) ("To make the inferential leap that plaintiff would like requires not
one inference, but a stacking of two inferences: that "I can't understand the way you speak" is a
comment about the plaintiff's accent, and that, in turn, a comment about the plaintiff's accent
suggests underlying bias against persons of Jamaican origin. Were there no other facts in this
record, it might be a close question whether these two remarks would be sufficient to defeat
summary judgment.").

conceded that he got along well with his supervisors and colleagues at Post, including Lizotte, the employee who terminated him. Jackson Dep., p. 286, l. 1-3.

Similarly, there is no evidence that Lizotte was affected by any racial bias in making his decision to discharge plaintiff. Lizotte made no discriminatory comments and exhibited no behavior suggesting that he harbored racial animus toward plaintiff. Rather, plaintiff himself testified that he got along well with Lizotte. Jackson Dep., p. 286, l. 1-3. Furthermore, Lizotte testified that he considered numerous factors beyond Silva's assessment of plaintiff's performance to make the decision to terminate plaintiff. Lizotte Dep., p. 55, l. 6-22   As stated *supra*, Lizotte made his own observations and received troubling input regarding plaintiff's lack of enthusiasm for his position from both Miciotta and Marrero. Lizotte Dep., p. 47, l. 6-24, and Ex. F.   In sum, there is no evidence that racial discrimination was a factor in Lizotte's decision to discharge plaintiff.

Finally, even if plaintiff believes that he was not the weakest field admissions representative at Post, his termination fails to support a Section 1981 claim if the termination was not based on racial animus. In other words, even had Lizotte mistakenly and subjectively undervalued plaintiff's abilities and attitude and/or singled plaintiff out for termination due an incomplete assessment, in the absence of proof that Lizotte acted *with racially discriminatory intent*, plaintiff's Section 1981 claim must fail. "It is "an essential element to [a Section 1981] cause of action that the alleged discrimination took place *because of the individual's race*." *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.,* 7 F.3d 1085, 1088 (2d Cir. 1993) (emphasis added).[73]

_____

[73]The Court also notes Post's non-discriminatory actions with respect to an admissions position that opened within the months following plaintiff's discharge. When the next position in admissions opened up, the "day admissions representative" position, Post rehired a former employee, an African American named Ron Sanders. As a member of the same protected class as plaintiff, Post's choice of Sanders weighs against the notion that plaintiff was terminated due

After careful review of the record in its entirety, and viewing the evidence in the light most favorable to plaintiff, the Court finds insufficient evidence of racial animus to support a valid Section 1981 or CFEPA claim.  Aside from one stray and ambiguous remark by Silva, there is no indication that any employee, supervisor, or manager of Post exhibited discriminatory intent toward plaintiff. Moreover, the record reflects that there were numerous instances, as described by Marrero, Miciotta and Lizotte, where plaintiff's attitude in performing his work-related duties was perceived as falling below defendant's desired standard.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court is constrained to grant summary judgment to defendant on plaintiff's claims arising under 42 U.S.C. § 1981 and the CFEPA.

One can accept the sincerity of Jackson's belief that Post was treating him unfairly, an impression perhaps subconsciously generated or strengthened by Post's earlier, mistaken and quickly rescinded termination of Jackson, an unfortunate and hurtful incident caused by the almost incomprehensible  incompetence of two senior Post administrators in failing to understand each other.  However, Jackson's claims of racial discrimination must be supported by proof of racial discrimination by Post.  The extensive record generated by wide-ranging discovery did not produce that evidence, and there is no reason to believe that a full plenary trial would do so.

With respect to plaintiff's Section 1981 claim, even assuming *arguendo* that  plaintiff is able to make out a *prima facie* case of race discrimination under the *McDonnell Douglas* standard – demonstrating that he is African-American, was qualified for his position, and was terminated under

to his race.

circumstances giving rise to an inference of discrimination – plaintiff has failed to offer evidence from which a reasonable jury could infer that the legitimate, nondiscriminatory reason Post offered for his discharge was a pretext for discrimination. Through Lizotte's testimony, Post established that one field admissions representative position was eliminated by Post's Board of Trustees due to budgetary cutbacks. Based on Lizotte's own observations and consistent input from all of plaintiff's supervisors, Lizotte decided to terminate plaintiff as lacking the necessary drive, determination, and initiative to perform adequately in his position.

In contrast, plaintiff demonstrated no facts or circumstances to prove that his discharge was based on racial animus. Rather, plaintiff relied solely on a "stray remark" of questionable meaning made by Silva during a lunch conversation. Plaintiff concedes that Silva was "playing" with him when he made the remark and that, aside from that comment, he and Silva got along well in their work interactions. There is no evidence that Silva's comment, or any alleged sarcasm or prejudice behind it, had any impact on Lizotte's decision to terminate plaintiff.

Furthermore, in addition to demonstrating a nondiscriminatory reason for discharge, Post proved that Lizotte played a substantial role in both hiring and terminating plaintiff within the relatively brief period of ten and one-half months, thereby creating a "same actor" inference against discriminatory bias.

In sum, plaintiff can point to no evidence sufficient to permit a rational trier of fact to find that his discharge was more likely than not motivated by discriminatory animus based on his race or color. Accordingly, summary judgment is hereby **GRANTED** to defendant on plaintiff's claim under 42 U.S.C. § 1981. There is no genuine issue of material fact and defendant is entitled to judgment as a matter of law.

Connecticut courts look to federal discrimination law for guidance in determining liability under CFEPA.  *Burbank v. Office of Atty. Gen. of Connecticut*, 240 F. Supp.2d 167, 175 (D. Conn. 2003).  Because federal law mandates the application of the *McDonnell Douglas* standard, summary judgment is likewise also **GRANTED** to defendant as to plaintiff's CFEPA claim, Conn. Gen. Stat. § 46a-60.    The Clerk is directed to close the file.

It is SO ORDERED.
Dated: New Haven, Connecticut
　　　December 7, 2011

　　　　　　　　　　　　　　 /s/Charles S. Haight, Jr.
　　　　　　　　　　　　　　Charles S. Haight, Jr.
　　　　　　　　　　　　　　Senior United States District Judge